```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
BENEX LC, on behalf of itself and
all others similarly situated,

                        Plaintiff,        MEMORANDUM & ORDER
                                          14-CV-6393(JS)(AKT)
        -against-

FIRST DATA MERCHANT SERVICES
CORPORATION,

                        Defendant.
----------------------------------------X
APPEARANCES
For Plaintiff:     Seth Rigrodsky, Esq.
                   Rigrodsky & Long, P.A.
                   919 North Market Street, Suite 980
                   Wilmington, Delaware 19801

                   Timothy J. MacFall, Esq.
                   Rigrodsky & Long, P.A.
                   585 Stewart Avenue, Suite 304
                   Garden City, New York 11530

For Defendant:     Noah Adam Levine, Esq.
                   Alan E. Shoenfeld, Esq.
                   Wilmer Cutler Pickering Hale and Dorr LLP
                   7 World Trade Center
                   250 Greenwich Street
                   New York, New York 10007

                   David C. Marcus, Esq.
                   Wilmer Cutler Pickering Hale and Dorr LLP
                   350 South Grand Avenue, Suite 2100
                   Los Angeles, California 90071
```

SEYBERT, District Judge:

This case arises out of a contract between Benex LC ("Benex" or "Plaintiff"), a merchant, and First Data Merchant Services Corporation ("First Data" or "Defendant"), a payment processor, for processing credit card and debit card transactions.

Currently pending before the Court is First Data's motion to dismiss the Complaint for failure to state a claim. (Docket Entry 14.) For the following reasons, First Data's motion is GRANTED.

BACKGROUND[1]

I. Factual Background

Benex is a merchant that accepts credit and debit cards, and First Data is a payment processor that facilitates credit and debit card transactions. (Compl., Docket Entry 1, ¶¶ 3, 23.) In March 2012, Benex and First Data entered into a contract for payment processing services, in which First Data would "perform various processing functions associated with card transactions such as authorizations, batching, clearing, and settlement" (the "Contract").[2][3] (Compl. ¶ 3; see Contract, Compl. Ex. A, Docket

---

[1] The facts alleged in the Complaint are presumed to be true for the purposes of this Memorandum and Order. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572, 127 S. Ct. 1955, 1975, 167 L. Ed. 2d 929 (2007) ("[A] judge ruling on a defendant's motion to dismiss a complaint must accept as true all of the factual allegations contained in the complaint." (internal quotation marks and citation omitted)).

[2] The Contract incorporates First Data's Program Terms and Conditions (the "Program Guide") by reference. (Contract at 14 ("Client further acknowledges reading and agreeing to all terms in the Program Guide, which shall be incorporated into Client's Agreement.").) The Program Guide details the parties' obligations and defines the majority of the Contract terms. (Program Guide, Section 38, Compl. Ex. B, Docket Entry 1-2, at 29-30; see also Payments Indus. Glossary, Compl. Ex. C, Docket Entry 1-3 (defining various industry terms).)

[3] The Court will use the page numbers given by the Electronic Case Filing System when referring to the Exhibits.

Entry 1-1.) Benex now alleges that First Data has failed "to refund 'interchange fees,' certain markups and surcharges added to interchange fees, 'dues and assessments' and 'network access fees,' and additional payment processor fees" to merchants such as Benex. (Compl. ¶ 1.) But first, some background.

In most credit or debit card transactions, six parties are involved: (1) the customer, (2) the issuing bank, (3) the merchant, (4) the payment processor, (5) the acquiring bank, and (6) the network--in other words, Visa, MasterCard, or Discover (collectively, as the "Card Brands"). The issuing bank issues a credit or debit card to a customer, who uses it to purchase goods or services from a merchant like Benex. (See Compl. ¶¶ 4, 23.) Next comes First Data, the payment processor, who "make[s] it possible for merchants to accept credit and debit card payments from their customers." (Compl. ¶ 3.) First Data's job is to submit the transaction to the network, which routes the transaction to the issuing bank. (See Compl. ¶ 3.) The network then requests that the issuing bank authorize or decline the transaction. If the transaction is approved, the issuing bank transmits the funds to the acquiring bank, which credits the merchant's account.[4]

---

[4] Ramon P. DeGennaro, 91 Fed. Reserve Bank of Atlanta Econ. Rev. 27 (2006), at 32-33, available at https://www.frbatlanta.org/-/media/Documents/research/publications/economic-review/2006/vol91no1_degennaro.pdf?la=en ("The processor's system reads the information and sends the authorization request to the specific issuing bank through the card network. The issuing

3

But the merchant does not receive the full amount of the purchase price because of various fees. One example is the interchange fee, which is paid to the issuing bank "to compensate for transaction-related costs" (the "Interchange Fees"). (Compl. ¶ 7; Payments Indus. Glossary at 9.) Additional fees include "dues and assessments" and "network access fees" (the "Card Brand Fees"). (Compl. ¶ 8.)

First Data, as the payment processor, also receives a fee for its services. (Compl. ¶ 9.) Two pricing options are relevant here. The first is a discount rate option (the "Discount Rate"), which is defined as "[a] percentage and/or amount charged a merchant for processing its qualifying daily Credit Card and Non-PIN Debit Card transactions . . . ." (Program Guide at 29.) The second is an interchange-plus option,[5] in which First Data charges the merchant for the actual Interchange Fees incurred, plus a markup. (Contract at 5.)

Benex selected the Discount Rate, which is 2.69% for Visa, Mastercard, and Discover.[6] (See Contract at 5.) The Discount

---

bank . . . either grant[s] or den[ies] authorization. The [acquiring bank] receives the response and relays it to the merchant.")

[5] The Contract also refers to this option as the "IC Pass Thru" option. (Contract at 5.)

[6] The Contract includes different columns for each pricing method. As is evident, the Discount Rate column is the only one completed. (Contract at 5.)

Rate is "[b]ased on [G]ross Transaction Volume." (Contract at 5.) "Gross" sales are based on "the total amount of Card sales, <u>without set-off for any refunds</u> or Credits." (Program Guide § 38 at 29 (emphasis added).)

It also bears noting that the Contract contained what appears to be a "notice of claim" provision. (<u>See</u> Contract ¶ 4 at 14.) Under the Contract, Benex agreed to "promptly and carefully review statements or reports . . . reflecting Card transaction activity." (Program Guide § 18.10 at 16.) Benex also agreed to notify First Data of any billing issues "within 60 days of the date where the charge or funding appears." (Contract ¶ 4 at 14; <u>see also</u> Program Guide § 18.10 at 16 ("If you believe any adjustments should be made . . . you must notify us in writing within sixty (60) days after any debit or credit is or should have been effected . . . .").) If Benex fails to do so, First Data "shall not have any obligation to investigate or effect any such adjustments." (Program Guide § 18.10 at 16.)

## II. <u>Procedural History</u>

Benex filed this lawsuit on October 29, 2014. (Docket Entry 1.) The Complaint asserts three causes of action: (1) breach of the implied covenant of good faith and fair dealing (Compl. ¶¶ 67-76), (2) conversion (Compl. ¶¶ 77-81), and (3) unjust enrichment (Compl. ¶¶ 82-84). Essentially, Benex offers two theories. The primary theory is that First Data failed to return

Interchange and Card Brand Fees, among others, when Benex provided refunds to its customers or when the Issuing Bank issued chargebacks.[7] (See, e.g., Compl. ¶¶ 1, 72.) The secondary theory is that First Data improperly charged an "additional discount rate on . . . returned transaction[s]." (Compl. ¶ 1 (internal quotation marks omitted).)

First Data moves to dismiss the Complaint. (Docket Entry 14.) In doing so, First Data makes three principal arguments: (1) the Contract's plain terms bar Benex's recovery because the parties chose the Discount Rate, which is not set-off by refunds (Def.'s Br., Docket Entry 15, at 10-17); (2) the conversion claim is duplicative of the implied covenant claim because they are based upon the same theories (Def.'s Br. at 18-19); and (3) the unjust enrichment claim, a quasi-contract remedy, is barred by the existence of the Contract (Def.'s Br. at 19-20).

Rejecting these arguments, Benex asserts that First Data breached the implied covenant of good faith and fair dealing by unlawfully retaining certain Interchange and Card Brand Fees. (Pl.'s Br., Docket Entry 22, at 12-20.) Also, Benex denies that the conversion claim is duplicative, arguing that it contains allegations that extend beyond the implied covenant claim. (Pl.'s

---

[7] A "chargeback" is a "transaction that is challenged by a cardholder or card issuing bank and is sent back through interchange to the merchant bank for resolution." (Payments Indus. Glossary at 5.)

6

Br. at 20-21.) Finally, Benex argues that although the Contract controlled the parties' relationship, the scope of the Contract is in dispute and thus, Benex can plead an unjust enrichment claim in the alternative. (Pl.'s Br. at 21-22.)

DISCUSSION[8]

I. Legal Standard

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. at 1974. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). Although the Court must accept all allegations in the Amended Complaint as true, this tenet is "inapplicable to legal conclusions." Id. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citation omitted). Ultimately, the Court's plausibility determination is a "context-specific task that requires the

---

[8] Under the Contract's choice of law provision, New York law controls. (Program Guide § 36.1 at 28.) Although "the choice of law provision does not apply to tort claims" such as the conversion claim, see, e.g., Taberna Preferred Funding II, Ltd. v. Advance Realty Grp. LLC, 45 Misc. 3d 1204(A) at *9 n.6 (N.Y. Cty. 2014), the parties agree that this claim is governed by New York law, too. (Compl. ¶¶ 28(e)(C); Def.'s Br. at 8 n.7.)

7

reviewing court to draw on its judicial experience and common sense." Id. at 679, 129 S. Ct. at 1950.

In deciding a motion to dismiss, the Court is generally confined to "the allegations contained within the four corners of [the] complaint." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998). However, the Court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (internal quotation marks and citation omitted); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (observing that a document is "integral" if the complaint "relies heavily upon its terms and effect") (internal quotation marks and citation omitted).

II. Implied Covenant of Good Faith and Fair Dealing

Benex argues that the Contract is silent "as to the disposition of any refunded Interchange and Card Brand Fees." (Pl.'s Br. at 14.) Benex further argues that although First Data did not breach the Contract by allegedly retaining those fees, First Data's actions undermined the purpose of the Contract and thus violated the implied covenant of good faith and fair dealing. (Pl.'s Br. at 12-13.) In opposition, First Data argues that the Contract unequivocally states that the Discount Rate is not "set-

8

off for any refunds or Credits." (Def.'s Br. at 13 (citing Program Guide § 38 at 29).)

In every contract, parties have an implicit duty of good faith and fair dealing. Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc., 429 F. Supp. 2d 582, 609 (S.D.N.Y. 2006). Under this implied covenant, "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990). Thus, one party may invoke the implied covenant of good faith and fair dealing where the other party "complied with the literal terms of the contract" but did "so in a way that undermines the purpose of the contract." In re HSBC Bank, USA, N.A., 1 F. Supp. 3d 34, 51 (E.D.N.Y. 2014) (internal quotation marks and citation omitted). Yet it bears emphasizing that "[t]he implied covenant 'can only impose an obligation consistent with other mutually agreed upon terms in the contract.'" Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005) (quoting Geren v. Quantum Chem. Corp., 832 F. Supp. 728, 732 (S.D.N.Y. 1993)). Nor can the implied covenant impose new duties outside the scope of the contract. Id. at 199; see also Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 199, 764 N.E.2d 958, 961, 738 N.Y.S.2d 658 (2001) (declining to "imply a term where the circumstances surrounding the formation of

the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue").

Here, the Contract's plain terms bars Benex's recovery. Benex agreed to pay the Discount Rate, which is "[b]ased on [G]ross Transaction Volume." (Contract at 5.) "Gross" sales "refer[] to the total amount of Card sales, <u>without set-off for any refunds</u> or Credits." (Program Guide § 38 at 29 (emphasis added).) That argument gains traction when reviewing the purpose of the Discount Rate--to compensate First Data for its services. Benex contends that First Data is "merely a conduit" for collecting Interchange Fees and Card Brand Fees. (Compl. ¶ 14.) But the Court is persuaded by First Data's counterargument--the Contract "is not an agreement to vest temporary possession of [these fees]." (Def.'s Reply Br., Docket Entry 23, at 2.) Instead, the Contract determined a price for First Data's services. To hold otherwise would jettison the terms of the Contract. See <u>Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.</u>, 86 N.Y.2d 685, 695, 660 N.E.2d 415, 421, 636 N.Y.S.2d 734 (1995) ("Freedom of contract prevails in an arm's length transaction between sophisticated parties such as these . . . .").

Benex's reliance on four Contract provisions does not change this result. (Pl.'s Br. at 13 (citing Contract at 8 and Program Guide §§ 1.9.3 at 8, 6.2 at 12, 18.4 at 16).) To begin with, two Contract provisions--Program Guide Sections 6.2

10

and 18.4--only discuss the potential for increased fees. (See Program Guide § 6.2 at 12 ("Late Submission . . . may result in increased interchange rates or fees or in a Chargeback to you.") (emphasis deleted); Program Guide § 18.4 at 16 ("[F]ees for Services . . . may be adjusted to reflect increases, or new fees . . . or to pass through increases or new fees.").) Similarly, the other two provisions--Program Guide Section 1.9.3 and page 10 of the Contract--involve the imposition of additional fees. (See Program Guide § 1.9.3 at 8 ("To the extent that you inadvertently or intentionally accept a transaction other than the type anticipated for your account, such transaction will downgrade to a higher cost . . . ."); Contract at 8 ("For processing each Non-Qualified Transaction, you will be assessed the Qualified Discount Rate and an additional fee.") (emphasis deleted).) But under the primary theory, Benex only contests that First Data withheld fees "comprising the [D]iscount [R]ate"--and the Discount Rate alone.[9] (Compl. ¶ 20.)

Separately, Benex's failure to comply with the Contract's notice provision also bars its recovery. (See Def.'s Br. at 15-16.) As this Circuit has recognized, "[e]xpress conditions must be literally performed; substantial performance

---

[9] The Complaint also asserts that First Data "improperly assess[ed] an additional discount rate on returned transactions," which is discussed below. (See Compl. ¶ 20.)

11

will not suffice." Travelers Cas. and Sur. Co. v. Dormitory Authority-State of N.Y., 735 F. Supp. 2d 42, 73 (S.D.N.Y. 2010) (internal quotation marks and citation omitted); D.C.R. Trucking & Excavation, Inc. v. Aetna Cas. and Sur. Co., No. 96-CV-3995, 2002 WL 32096594, at *6 (E.D.N.Y. Oct. 31, 2002) ("Failure to strictly comply with contractual notice and documentation provisions has been held to constitute a waiver of any claim for damages."). Here, the Program Guide clearly requires Benex to notify First Data of any billing issues "within 60 days of the date of the statement where the charge or funding appears." (Contract ¶ 4 at 14; see also Program Guide § 18.10 at 16 ("If you believe any adjustments should be made . . . you must notify us in writing within sixty (60) days after any debit or credit is or should have been effected . . . .").) The failure to do so relieves First Data of any liability. (Program Guide § 18.10 at 16 (stating that if Benex fails to notify First Data within the applicable time period, First Data "shall not have any obligation to investigate or effect any such adjustments").)

Although Benex argues that it "had no way of knowing that [certain] refunds were being improperly retained by [First Data]," (Pl.'s Br. at 18), that argument is belied by the Complaint (Compl. ¶¶ 64-66). Benex's Card Processing Statement for February 2013, for example, shows a credit reversal of $35.24, and Benex alleges that First Data "improperly retained the Interchange Fee,

12

Card Brand Fee and other processing fees associated with [the] $35.24 transaction." (Compl. ¶¶ 64-66 (depicting images of the Card Processing Statement for February 2013).) This example alone should have triggered the notice of claim provisions.

Moreover, Benex's secondary theory--that First Data "improperly and without any authority charges its merchant-customers as additional 'discount rate' on the amount of the return transaction"--offers no support. (See Compl. ¶ 1); Pl.'s Br. at 19-20.) Benex has failed to provide First Data "with sufficient notice of the claims against it." See Paulstich v. Merrick Post Office, No. 14-CV-2169, 2014 WL 1411758, at *3 (E.D.N.Y. Apr. 11, 2014); FED R. CIV. P. 8(a)(2). The Complaint does not define what the additional discount rate is, nor does Benex allege that it paid this additional discount rate. In fact, Benex concedes that it "did not expressly allege that it was charged an additional fee or the discount rate upon issuance of the refund." (Pl.'s Br. at 20 n.11.)

Even still, the Court will grant Plaintiff leave to replead to cure any deficiencies with an amended complaint. Thus, Benex's implied covenant claim is DISMISSED WITHOUT PREJUDICE.

III. Conversion

Next, First Data asserts that Benex's conversion claim must be dismissed because it is duplicative of its implied covenant claim. (Def.'s Br. at 18-19.) Particularly, First Data argues

13

that Benex's "conversion allegations are substantively identical to its implied-covenant allegations--i.e., that First Data, without authority, failed to refund fees." (Def.'s Br. at 18-19.)

Under New York Law, "[c]onversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997) (internal quotation marks and citation omitted). To plausibly allege a conversion claim, a plaintiff must show: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." Moses v. Martin, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (internal quotation marks and citation omitted). Yet "a claim to recover damages for conversion cannot be predicated on a mere breach of contract." Wolf v. Nat'l Council of Young Israel, 264 A.D.2d 416, 417, 694 N.Y.S.2d 424, 425 (2d Dep't 1999). Put differently, "a plaintiff must allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights." Fraser v. Doubleday & Co., 587 F. Supp. 1284, 1288 (S.D.N.Y. 1984); AD Rendon Commc'ns, Inc. v. Lumina Americas, Inc., No. 04-CV-8832, 2006 WL 1593884, at *4 (S.D.N.Y. June 7, 2006)

14

(finding a conversion claim to be duplicative of a breach of contract claim when the defendant merely "transferred and retained monies that contractually belonged to [the p]laintiff").

Benex's conversion claim is based upon the same theory of the implied covenant claim--that First Data wrongfully collected certain funds. (<u>Compare</u> Compl. ¶ 72 (asserting a breach of implied covenant claim because "Interchange Fees and Card Brand Fees are not collected for the benefit of [First Data], and it has no claim to such amounts") <u>with</u> Compl. ¶ 79 (asserting a conversion claim because First Data "has wrongfully collected and retained refunded Interchange Fees" and "Card Brand Fees").) In other words, the conversion claim does not addresses a wrong separate and apart from the implied covenant claim. <u>Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.</u>, No. 08-CV-10578, 2010 WL 1257326, at *10 (S.D.N.Y. Mar. 12, 2010) (dismissing a conversion claim because it was "entirely predicated on [a] breach of contract claim"). Thus, Benex's conversion claim is DISMISSED WITH PREJUDICE.

IV. <u>Unjust Enrichment</u>

Finally, First Data contends that Benex's unjust enrichment claim is barred by the existence of the Contract. (Def.'s Br. at 19-20.) The Court agrees.

To establish unjust enrichment in New York, a plaintiff must prove "'(1) that the defendant benefitted; (2) at the

15

plaintiff's expense; and (3) that equity and good conscience require restitution.'" Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006) (quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)). As a quasi-contract remedy, unjust enrichment is "an obligation the law creates in the absence of any agreement." Id. at 586-87 (internal quotation marks and citation omitted) (emphasis in original). Generally, a party cannot maintain an unjust enrichment claim when a valid and enforceable contract governs the dispute at issue. See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388, 516 N.E.2d 190, 193, 521 N.Y.S.2d 653 (1987). Sure enough, a party may only proceed under "both breach of contract and quasi-contract theories where there is a bona fide dispute as to the existence of a contract." Curtis Props. Corp. v. Greif Cos., 236 A.D.2d 237, 239, 653 N.Y.S.2d 569, 571 (1st Dep't 1997); see Nakamura v. Fujii, 253 A.D.2d 387, 390, 677 N.Y.S.2d 113, 116 (1st Dep't 1998).

Here, there is no bona fide dispute: The Contract governed the parties' relationship. (See, e.g., Compl. ¶¶ 18, 23.) And, as stated above, the scope of the Contract is not in dispute because Benex agreed to pay the Discount Rate for First Data's payment processing services. (See Pl.'s Br. at 21-22.) Thus, Benex's unjust enrichment claim is DISMISSED WITH PREJUDICE.

16

VI. Leave to Amend

The Second Circuit has stated that "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." Hayden v. Cnty. of Nassau, 180 F.3d 42, 53 (2d Cir. 1999) (citing Ronzani v. Sanofi S.A., 889 F.2d 195, 198 (2d Cir. 1990)); see also FED. R. CIV. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). For the reasons discussed above, Benex is granted leave to replead only its implied covenant claim.

## CONCLUSION

Defendant's motion to dismiss the Complaint (Docket Entry 14) is GRANTED. Plaintiff's conversion and unjust enrichment claims are DISMISSED WITH PREJUDICE. Plaintiff's implied covenant claim, however, is DISMISSED WITHOUT PREJUDICE and with leave to replead. If Plaintiff wishes to file an Amended Complaint, it must do so within thirty (30) days of the date of this Memorandum and Order. If Plaintiff fails to do so, its claims will be dismissed with prejudice and the case will be closed.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: March __16__, 2016
       Central Islip, New York