**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BENEX LC, on behalf of itself and all others similarly situated, | Case No. 14-CV-6393 (JS) (AKT) |
| Plaintiff, | **Jury Trial Demanded** |
| v. | |
| FIRST DATA MERCHANT SERVICES CORPORATION, | |
| Defendant. | |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiff Benex LC ("Plaintiff"), through its undersigned counsel, on behalf of itself, and all others similarly situated, alleges the following based on personal knowledge as to allegations regarding Plaintiff and on information and belief as to all other allegations.

## I.  INTRODUCTION

1.      This is a civil action seeking monetary damages and restitution from Defendant First Data Merchant Services Corporation ("FDMS") for the unauthorized failure to refund "interchange fees," "dues and assessments" and "network access fees" to merchants who have contracted with FDMS for MasterCard Incorporated ("MasterCard") credit and debit card payment processing either directly with FDMS or through a member service provider (defined below).

2.      FDMS serves as a credit and debit "card payment processor" for card payment transactions, *i.e.*, purchases made with MasterCard credit and debit cards.  Card processors such as FDMS make it possible for merchants to accept credit and debit card payments from their

customers. Specifically, merchants enter into agreements with FDMS to perform various processing functions associated with card transactions such as authorizations, batching, clearing, and settlement. FDMS coordinates communications between: (i) its partner banks (often referred to as the "merchant acquiring bank") for MasterCard transactions, and (ii) the financial institution that issued the credit or debit card used by the consumer ("Card Issuer" or the "Issuing Bank").

3. For transactions involving credit and debit cards issued by MasterCard and Visa U.S.A. Inc. ("Visa"), an issuing bank must be a member of Visa or MasterCard, as applicable. As a member, an issuing bank is licensed to issue cards to consumers as cardholders. DFS Services LLC ("Discover") issues most of its own cards directly to consumers through Discover Bank, although GE Consumer Finance and certain others are also authorized to issue Discover cards. MasterCard, Visa and Discover are referred to herein as the "Card Brands," and MasterCard is sometimes referred to herein as a "Card Brand." Therefore, for MasterCard card transactions, an Issuing Bank must be a member of MasterCard. MasterCard is sometimes referred to herein as a "Card Brand." As a member, an Issuing Bank is licensed to issue cards to consumers as cardholders. FDMS, while not a "bank," is an "acquirer" for the purposes of processing card transactions for its merchant-customers, as FDMS performs most of the card processing and settlement functions for MasterCard and other Card Brands payments for its partner banks.

4. A member service provider ("MSP") indirectly performs certain of the sales and customer service functions of FDMS. MSPs purchase excess processing capacity from FDMS, and use FDMS's applications and terms and conditions (also referred to as "program guides"), in each case with minimal changes (not relevant to this action) for merchant customers of FDMS

2

that are placed on the processing platform maintained by FDMS.  As such, MSPs serve as sales entities for FDMS, signing-up merchants for FDMS's card processing services.  In all cases, the parties to the card processing contract include the merchant and FDMS.

5.      A merchant who accepts a bank card as payment for goods or services is not credited with the full amount of the purchase price by the acquirer.  This is because fees are assessed at various points in the processing of card payments and collected by the acquirer.  One such fee is the "interchange fee," which is an amount determined by the applicable Card Brand and paid to the Card Issuer or Issuing Bank to process the transaction (the "Interchange Fee"). The Interchange Fee typically consists of a percentage of the purchase price plus a fixed fee per transaction, which when combined equals approximately 2% of the purchase price.  There are many Interchange Fee categories and corresponding percentages, and the Interchange Fee rates are set by the applicable Card Brand, not by the issuers.

6.      Additional fees, known as "dues and assessments" and "network access fees" are paid to the Card Brand (the "Card Brand Fee") pursuant to agreements between FDMS and the Card Brand.   These fees amount to approximately 0.1% of the purchase price, plus approximately two cents per transaction, depending upon, and as determined by, the applicable Card Brand.

7.      FDMS is merely a conduit for the collection of Interchange Fees and Card Brand Fees.  Thus, where the Card Issuer or Card Brand increase the applicable Interchange Fee, or impose additional surcharges, FDMS passes these increased costs or additional fees through to the merchant.

8.      As an acquirer, FDMS is bound by the rules of the Card Brands, including the MasterCard Rules.  *See* MasterCard Rules (15 December 2015) ("MC Rules") (copy annexed

3

hereto as Exhibit A), § 5.1 at 75.  Pursuant to FDMS's agreements, merchants must also adhere to rules of the Card Brands including MasterCard. *See* FDMS Merchant Processing Application and Agreement (the "Application") (copy annexed hereto as Exhibit B), Part V at 13 of 13 (referencing MasterCard Regulations).  Although not parties to the agreements between FDMS and the Card Brand, merchants are third-party beneficiaries of those agreements. *See, e.g.*, MC Rules, Ex. A, § 5.3 at 79 ("An Acquirer must fulfill all of the obligations set forth in this Rule 5.3 with respect to each of its Merchants.").

9.      The large majority of agreements between FDMS and individual merchants contain bundled "discount rate" pricing terms.  Under a bundled discount rate program, FDMS (for itself or on behalf of the relevant MSP) will collect payment processor fee markups or surcharges added to the Interchange Fee, which can be an additional 3% (or more) of the amount of the transaction, along with Card Brand Fees.  As such, the "discount rate" includes the actual Interchange Fee plus the mark-up/surcharges, combined into a single percentage called a discount.  Card Brand Fees are sometimes charged separately, and are sometimes included in the discount.  The amount collected by FDMS as a "discount" may also include a fixed fee per item on each transaction, and other fees, including the fees charged by FDMS.  The process is opaque, in that the merchant is not advised how the discount rate is determined.

10.     In addition, the discount rate in a bundled discount rate program is usually multi-tiered.  The lowest contracted discount rate applies only to "qualified" MasterCard purchases; transactions that do not qualify for the lowest discount rate are subject to "downgrades" into categories commonly referred to as "mid-qualified" and "non-qualified," and progressively higher discount rates are associated therewith.  Merchants are not told why transactions are

downgraded into more costly discount rates, and they frequently find the quantity of downgraded mid-qualified and non-qualified transactions exceed those of qualified transactions.

11.     When a merchant utilizing a discount rate pricing plan with FDMS issues a credit refund to its customer after the completion of a sale, or a transaction is challenged by a cardholder or a Card Issuer and is sent back through the interchange system to the acquirer (*e.g.,* FDMS) for resolution (a "chargeback"),[1] the Card Issuer and Card Brand refund the Interchange Fee and the Card Brand Fee, respectively, to FDMS.  *See* MasterCard Transaction Processing Rules (21 January 2016) ("MC TPR") (copy annexed hereto as Exhibit C), § 2.13 at 48 ("A correction must be performed as a Card-read Transaction initiated by or on behalf of the Cardholder with either PIN or signature as the Cardholder verification method. The Acquirer assumes the risk for this message type and *the interchange fee is returned to the Acquirer from the Issuer.*"); §3.10.1 at 88 ("If the original POS Transaction was a Card-not-present Transaction, then the presentation of a Card is not required for the refund Transaction. *The proportional interchange fee associated with the original POS Transaction is reversed in the refund Transaction.*") (emphasis added).[2] FDMS, however, does not refund these fees to the discount rate pricing plan merchants, but instead retains the fees despite the fact that it has no contractual authority or other authority to do so.

12.     FDMS's improper retention of the refunds of Card Issuer and Card Brand Fees on reversed transactions is contrary to the intent of the controlling MC Rules and MC TPR, which is to reverse the transaction so that merchants are not penalized by paying Card Brand and Card

---

[1] For example, a chargeback would occur when an on-line purchaser claims she never received the product she ordered and contacts her Card Issuer to dispute the charge.

[2] Similar provisions are set forth in the applicable rules and regulations governing Visa and Discover.

Issuer for services on transactions that have been negated by refunds to the cardholder or by chargebacks.  FDMS, which has already included its markup, or fee, in the discount rate charged to merchants, therefore, enjoys an improper windfall by retaining these refunds. For example, FDMS admitted that it received 2.21% of the Plaintiff's February 14, 2013 sales transaction representing a refund of the Interchange and Card Brand Fees on or about February 19, 2013. *See* Defendant's First Answers and Objections to Plaintiff's First Set of Interrogatories, dated March 23, 2015 ("FDMS Interrogatory Resp.") (copy annexed hereto as Exhibit D), Answer to Interrogatory #5 at 12.  Because fees associated with use of the MasterCard system are paid by the merchants separately (Ex. B at 4 of 14), the difference between the 2.69% discount rate paid by Plaintiff on this transaction (*id*. at 5 of 15) and the 2.21% refunded by the Card Brand (which difference is .48%) represents the markup, or fee, that FDMS made for processing services on the February 14, 2013 sales transaction. Had there been no customer refund, FDMS would be entitled to no additional monies under its agreement with Plaintiff.  Because of the refund to the cardholder, however, FDMS made ***approximately five and one-half times*** what it would have made had it not improperly retained the refunded Card Brand and Card Issuer Fees clearly intended under the MC Rules for return to the merchant.  Moreover, Plaintiff – who made no money on the transaction due to the reversal of that sale – has, in essence, paid FDMS for services from the Card Brand and Card Issuer that were never received.

13.     In addition, FDMS imposes the same charge twice on merchants utilizing the discount rate pricing plans in the event of refunds or chargebacks.  Upon the credit card sale, FDMS imposes a "MC/V/Discover Network Auth & Ret Trans Fee" for each transaction.  If a transaction is reversed, FDMS again charges the merchant a second MC/V/Discover Network Auth & Ret Trans Fee.  While shown as a single fee in the Application (Exhibit B at 4 of 13), it

6

is identified as two different and distinctly entitled fees on merchant account statements.  *See* Benex LC Card Processing Statement (02/01/13 – 02/28/13) ("February Statement") (copy annexed hereto as Exhibit E) at 4 of 6 (showing "MASTERCARD AUTH FEE" and "MASTERCARD CREDITS TRANS FEE" as separate entries dated 02/28/13).   Nowhere in the FDMS agreements with its merchants does FDMS indicate that an additional fee is imposed for reversed transactions.

14.     Moreover, the account statements provided to merchants by FDMS do not indicate when the Interchange or Card Brand Fees are refunded to FDMS.  For example, despite admitting that it received a refund of the Card Brand and Card Issuer Fees totaling 2.21% of a February 14, 2013 transaction representing a refund of the Interchange and Card Brand Fees on or about February 19, 2013 (Exhibit D, Answer to Interrogatory #5 at 12), the account statement provided to Plaintiff shows no fees refunded by the Card Brand or Card Issuer, nor does it show that such fees were retained by FDMS.  *See* Ex. E.  Thus, merchants do not, and cannot, know that FDMS has received, much less failed to remit to the merchant, refunded fees from the Card Issuers and Card Brands.  Likewise, because the MC/V/Discover Network Auth & Ret Trans Fee is shown separately on merchant account statements, merchants do not, and cannot, know that they are assessed the same fee twice in connection with reversed transactions.  Accordingly, merchants do not, and cannot know, to demand refunds of Interchange and Card Brand Fees in connection with a credit refund or chargeback, or to challenge the imposition of a second MC/V/Discover Network Auth & Ret Trans Fee upon reversal of a credit card transaction.

15.     FDMS has failed to pay discount rate pricing merchants millions of dollars of Interchange Fees and Card Brand Fees refunded by the Card Brands and Card Issuers on cardholder refunds and chargebacks, even though it has no contractual or other basis for failing

7

to refund such funds to the merchants.  Likewise, it improperly imposes the same fee twice for reversed card transactions, despite any contractual provision that permits it to impose additional fees in connection with reversed transactions.

16.     Accordingly, FDMS has breached and continues to breach the implied covenant of good faith and fair dealing implicit in the FDMS Application and the FDMS Merchant Services Program Terms and Conditions (Program Guide) ("Program Guide") (copy annexed hereto as Exhibit F) with Plaintiff and substantially similar agreements with members of the Class (defined below).[3]

17.     In addition, FDMS has breached its agreements with the Card Brand by failing to pay refunded Interchange and Card Brand Fees to the merchants.  The MC Rules and the MC TRP are contracts between MasterCard and FDMS.  Plaintiff, and other merchants utilizing FDMS discount rate pricing, are third party beneficiaries to those agreements.  FDMS's failure to pay discount rate pricing merchants the fees refunded by the Card Brand and Card Issuers where a transaction has been reversed due to a refund issued to a cardholder, or in the event of a chargeback, constitutes a breach of the FDMS agreements with the Card Brand.

## II.  JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This is a class action in which:  (i) the aggregate amount in controversy exceeds $5,000,000; (ii) the proposed class consists of hundreds if not thousands of merchants who are contracting or have contracted with FDMS for MasterCard credit and debit card

---

[3] The Program Guide relating to Plaintiff is issued by Sovereign Merchant Services.  The Application shows that Sovereign Merchant Services is a "d/b/a" for FDMS. (*See* Ex. A, p. 4). The Program Guide and the Application, collectively, constitute the agreement between Plaintiff and FDMS (the "Agreement").

payment processing services, and who had refunds of Interchange Fees and Card Brand Fees resulting from chargebacks from Card Issuers, or from credit refunds (under bundled discount rate programs) issued by merchants to MasterCard cardholders after the completion of a sale, that in each case were retained by FDMS and/or were not refunded,  and/or were charged the same fee twice for reversed credit card transactions; (iii) a member of the class is a citizen of State different from any defendant; and (iv) the Program Guide states the "Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to its choice of law provisions)." *See* Ex. F, section 36.1, p. 26.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).  The Program Guide states that FDMS has "substantial facilities in the State of New York and many of the services provided under the Agreement are provided from these facilities."  Ex. F, § 36.2, p. 26. In addition, the Program Guide provides that the appropriate federal or state court located in Suffolk County, New York shall be "[t]he exclusive venue for any actions or claims arising under or related to this Agreement."  *Id.*

### III.  THE PARTIES

20.     Plaintiff Benex LC is, and at all relevant times has been, a citizen of the State of Pennsylvania.  Plaintiff is a merchant who has a bundled discount rate pricing contract with FDMS (d/b/a "Sovereign Merchant Services") containing the terms of the Application and Program Guide, for MasterCard credit and debit card payment processing services, and who failed to receive one or more Interchange Fee and/or Card Brand Fee, and was charged the same fee twice by FDMS following the issuance of one or more MasterCard credit refunds to a customer by Plaintiff and/or the issuance of one or more MasterCard chargebacks to Plaintiff by a Card Issuer.

21.     Defendant FDMS is a Florida corporation whose principal executive offices are located at 5565 Glenridge Connector, N.E., Suite 2000, Atlanta, Georgia 30342.  FDMS is a wholly-owned subsidiary of First Data Corporation ("FDC").  FDC is a Delaware corporation whose principal executive offices are located at the same address as FDMS.

## IV.  CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(b)(3), on behalf of itself and all others similarly situated.  The proposed Class is defined as:

> All merchants nationwide who have or have had, within the applicable statute of limitations preceding the filing of this action: (1) an agreement with FDMS for MasterCard credit and debit card payment processing services, using the discount rate pricing terms set out in the Application and Program Guide, or substantially similar terms and conditions, and (3) who did not receive an Interchange Fee or Card Brand Fee refund after the merchant (i) issued a credit refund to its customer or (ii) received a chargeback from the Card Issuer, in each case due to FDMS's retention of the Interchange Fee refund and/or Card Brand Fee refund, and/or (4) were charged MC/V/Discover Network Auth & Ret Trans Fee, or equivalent fee, twice in connection with a customer transaction that resulted in a cardholder refund or chargeback.

23.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

24.     Excluded from the Class are Defendants and their parents, subsidiaries, affiliates, officers and directors, any entity in which Defendants have a controlling interest, all persons and entities who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff.

25.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

(a)      **Numerosity Under Rule 23(a)(1):**   The members of the Class are so numerous that individual joinder of all such members is impracticable.  Plaintiff is informed and believes there are at least many hundreds, and more likely many thousands, of customers of FDMS who have been damaged by its unfair and improper conduct alleged herein.

(b)      **Commonality Under Rule 23(a)(2):** This action involves common questions of law and fact, including, but not limited to, whether FDMS:

- failed to pay Interchange Fees and Card Brand Fees refunded by Card Issuers and Card Brand, respectively, to merchants with which it contracts, or has or contracted, for MasterCard payment processing on a discount rate pricing basis, where there was a refund issued by the merchant to a consumer upon reversal of a credit card sales transaction;

- failed to pay Interchange Fees and Card Brand Fees refunded by Card Issuers and Card Brand, respectively, to merchants with which it contracts, or has contracted, for MasterCard payment processing on a discount rate pricing basis, where there was a chargeback by the Card Issuer;

- charged merchants utilizing discount rate pricing the same fee twice where sales transactions were reversed due to a customer refund or chargeback where a credit return was initiated by the merchant for the benefit of the cardholder, or a chargeback was initiated by the Card Issuer;

- has any contractual or other basis for retaining any of the above-described refunded fees, or for charging the above-described MC/V/Discover Network Auth & Ret Trans Fee, or equivalent fee, twice where sales transactions were reversed due to a customer refund or chargeback where a credit return was initiated by the merchant for the benefit of the cardholder, or a chargeback was initiated by the Card Issuer;

- failed to inform merchants with which it contracts or contracted for MasterCard card payment processing on a discount rate pricing basis that it retains the above-described fees refunded by the Card Issuer and/or Card Brand where a credit return was initiated by the merchant for the benefit of the cardholder, or a chargeback was initiated by the Card Issuer;

- failed to inform merchants with which it contracts or contracted for MasterCard payment processing on a discount rate pricing basis that it charges the above-described MC/V/Discover Network Auth & Ret Trans Fee, or equivalent fee, twice where sales transactions were reversed due to

a customer refund or chargeback where a credit return was initiated by the merchant for the benefit of the cardholder, or a chargeback was initiated by the Card Issuer;

- failed to provide regular statements to merchants with which it contracts or contracted for MasterCard payment processing on a discount rate pricing basis that indicated that FDMS receives and/or retains the above-described fees refunded by Card Issuers and Card Brand in connection with reversed transactions;

- failed to provide regular statements to merchants with which it contracts or contracted for MasterCard card payment processing on a discount rate pricing basis that indicated that it charges the above-described MC/V/Discover Network Auth & Ret Trans Fee, or equivalent fee, twice where sales transactions were reversed due to a customer refund or chargeback where a credit return was initiated by the merchant for the benefit of the cardholder, or a chargeback was initiated by the Card Issuer;

- engaged in practices that have damaged Plaintiff and members of the Class;

- breached the implied covenants of good faith and fair dealing;

- and, breached the agreements between it and MasterCard by failing to pay Interchange and Card Brand Fees refunded by Card Issuers and Card Brands to merchants utilizing discount rate pricing, and Plaintiff and other members of the Class are third party beneficiaries of such agreements between FDMS and MasterCard.

(c)     **Typicality Under Rule 23(a)(3):**  The named Plaintiff's claims are typical of (and not antagonistic to) the claims of the members of the Class.  Plaintiff, like all members of the Class, has been subject to FDMS's Interchange Fee refund, Card Brand Fee refund, and other discount rate policies and practices and has been damaged by its misconduct in that Plaintiff improperly failed to be credited with Interchange Fee refunds and Card Brand Fee refunds, and further was charged the same fee twice, once for the sale and once for the reversal of the sale, on certain transactions.  Furthermore, the factual bases of FDMS's misconduct are common to all

members of the Class and represent a common thread of unfair and/or deceptive misconduct by FDMS that breaches its implied covenant of good faith and fair dealing, as well as the contracts between FDMS and MasterCard to which Plaintiff and all other members of the Class are third party beneficiaries, and results in injury to all members of the Class.

(d)  **Adequacy of Representation under Rule 23(a)(4):**  Plaintiff is committed to the vigorous prosecution of this action.  Plaintiff will fairly and adequately protect the interests of the members of the Class, and Plaintiff's interests are coincident with and not antagonistic to those of the other Class members Plaintiff seeks to represent.  Plaintiff's counsel is experienced in the prosecution of class actions.

(e)  **The Class Can Be Properly Maintained Under Rule 23(b)(3):** Questions of law common to the members of the Class predominate over any questions affecting only individual members with respect to some or all issues presented in this Complaint.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  To this end:

(A)   individual litigation of the claims of all members of the Class is impracticable because the cost of litigation would be prohibitively expensive for each member of the Class and would impose an immense burden upon the courts;

(B)   Plaintiff is aware of no pending litigation concerning the controversy already begun by Class members;

(C)   concentrating the litigation of the claims in this forum is highly desirable because individualized litigation would present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same complex factual and legal issues, and for the

further reason that Defendants have consented to the Court's jurisdiction and venue and the applicability of New York law; and

(D)    the conduct of this action as a class action, with respect to the issues presented in this Complaint, presents minimal management difficulties, conserves the resources of the parties and of the court system, and is the only means to protect the rights of all members of the Class.

## V. <u>SUBSTANTIVE ALLEGATIONS</u>

26.    Plaintiff and the Class members obtain MasterCard card processing services from FDMS by executing the Application (Ex. B), or a substantially similar document, and the confirmation page included with the Program Guide (Ex. F), or a substantially similar document. The Program Guide, which is incorporated into the Application by reference (*see* Ex. B at 5 of 14), contains the majority of the contract terms and conditions between FDMS and the individual merchant.  *See* Ex. F.

27.    The Preface to the Program Guide states that the "Card Organizations charge Acquirers interchange fees and assessments for submitting transactions into their systems" and "[a] substantial portion of the Discount Rate or Transaction Fees that you [the merchant] pay will go toward these fees and assessments." (*See* Ex. F, Preface at 2 of 55).

28.    The Program Guide does not address the issue of refunds of Interchange Fees, Card Brand Fees, or any other costs comprising the discount rate charged to merchants.  Section 10.2 of the Program Guide states that FDMS may "debit your Settlement Account or your settlement funds in the event we are required to pay Card Organization [*i.e.*, MasterCard] fees, charges, fines, penalties or other assessments as a consequence of your sales activities."  It goes on to list examples of such debits, one of which is "[s]hipping and handling interchange fees."

14

29.     Section 10.2 is inapplicable to *refunds* of Interchange Fees, Card Brand Fees, and other costs comprising the discount rate, as they are not charges FDMS is "required to pay" due to a merchant's sales activities, nor does the example apply to *refunds* of "shipping and handling interchange fees."

30.     Consequently, while FDMS may debit a merchant's account for the Interchange Fees and Card Brand Fees it is required to pay when processing a merchant's sales, it lacks contractual authority, or any other justification, to retain such amounts when such fees are refunded.

31.     The First Data Payments Industry Glossary (2012) ("Glossary") (copy annexed hereto as Exhibit G)) defines the interchange fee as "[f]ees paid by the acquirer to the issuer to compensate for transaction-related costs." (*Id*. at 8).

32.     FDMS acts as a middleman or conduit for the collection and crediting of the part of the discount rate comprising Interchange Fees and Card Brand Fees.   In other words, when a merchant who has contracted with FDMS for card payment processing presents a charge for processing, FDMS deducts the Interchange Fee from the purchase amount and forwards such fee to the appropriate Card Brand network (*e.g.*, VisaNet for Visa, Banknet for MasterCard, Discover Network for Discover) for payment to the Card Issuer, and deducts the Card Brand Fees and forwards such fees to the appropriate Card Brand network for the benefit of that Card Brand.  Further, FDMS deducts the remainder of the discount rate for its own benefit and/or the benefit of an MSP that may have presented the merchant to FDMS for processing services.

33.     Section 10.2 of the Program Guide, "other Debits," illustrates that FDMS acts as a conduit for payment of Interchange and Card Brand Fees.  Ex. F, p. 13.  In pertinent part, that section provides that FDMS may debit a merchant's account or settlement funds "in the event we

15

are required to pay Card Organization fees, charges, fines, penalties or other assessments as a consequence of your sales activities."  *Id*.  Moreover, the Program Guide provides that FDMS "may add to or delete from this list as changes occur in the Card Organization Rules . . . ."  *Id*.

### MasterCard Rules

34.    The MC Rules, along with other applicable agreements, govern the relationship between MasterCard and acquirers.  Section 5.3 of the MC Rules provides that "[a]n Acquirer must fulfill all of the obligations set forth in this Rule 5.3 with respect to each of its Merchants." Ex. A at 79.  The MC Rules further provide:

**5.3.1 Payment for Transactions**

The Acquirer *must pay* the Merchant the amount (either gross or net of Merchant discount or setoff) *of all Transactions that the Acquirer acquires from the Merchant* in accordance with the Merchant Agreement and the Standards. This obligation is not discharged with regard to a Transaction until the Merchant receives payment from the Acquirer that acquired the Transaction, notwithstanding any Acquirer payment arrangement, including any such arrangement between an Affiliate and its Sponsor. A Merchant Agreement may provide for an Acquirer to withhold amounts for chargeback reserves or similar purposes in accordance with the Standards.[4]

Ex. A at 79 (emphasis added).  The MC Rules, therefore, establish that merchants are intended third party beneficiaries of the agreements between MasterCard and acquirers, such as FDMS. While the foregoing provision authorizes acquirers, such as FDMS, to deduct the merchant discount from the monies initially payable to the merchant, it does not address what monies are payable by the merchant to the acquirer where the transaction is reversed (such as where there is a refund issued by the merchant to the cardholder or a chargeback), nor does it authorize the

---

[4] The Standards are set forth the MC Rules.

acquirer to retain refunded fees previously paid by the merchant where the transaction is reversed (such as when Interchange and Card Brand Fees are refunded).  Indeed, other MasterCard rules are to the contrary.

35.   The MC TPR states that "[a] correction must be performed as a Card-read Transaction initiated by or on behalf of the Cardholder with either PIN or signature as the Cardholder verification method.  The Acquirer assumes the risk for this message type and *the interchange fee is returned to the Acquirer from the Issuer*."[5]  Ex. C at 48 (emphasis added). Likewise, the "Refund Transactions" section of the MC TPR further provides that with respect to merchant-issued refunds to cardholders, "[t]he proportional interchange fee associated with the original POS Transaction *is reversed* in the refund Transaction."  *Id*. at 88 (emphasis added).

36.   The use of the term "reversed" shows that MC TPR clearly requires that the interchange fee associated with the original transaction will be returned, via the acquirer, to the merchant.  Because the interchange fee on the original transaction is deducted by the acquirer and then forwarded by the acquirer to the Card Brand, here MasterCard, such fees are simply sent back through the same conduit through which they were paid, namely through the acquirer. There is no reason for MasterCard to refund the interchange fee to the acquirer unless it is to return that fee to the merchant.  Upon reversal of the transaction in a merchant-issued cardholder refund, any risk to the Issuing Bank or Card Brand associated with the transaction – the justification for the imposition of the Interchange and Card Brand Fees – has been eliminated;

---

[5]   A "correction" is defined in the MC TPR as "a single message authorization request containing a value of 20 in DE 3 (Processing Code), subfield 1 (Cardholder Transaction Type Code) that is used in a Card-present environment following a single message POS Transaction approval to remedy a Merchant or Cardholder error."  Ex. C, p. 48.

therefore, there is no economically rational reason for MasterCard to pay Interchange and Card Brand Fees to the acquirer, unless such fees are to be returned to the merchant.

37.     Notably, the MasterCard U.S. Merchant Acceptance Guide (17 December 2010) ("MC Merchant Guide") (copy annexed hereto as Exhibit I) which "provides guidelines and best practices for merchants in the U.S. region that accept MasterCard cards" (*id*. at 1-1), defines "refund" as the "[o]pposite of a purchase transaction, namely, the cardholder returns goods to the merchant and is credited for their value. *Positive interchange and merchant service charge are reversed*") (emphasis added).   This definition also shows that the agreements between MasterCard and acquirers, such as FDMS, require that the Interchange and Card Brand Fee refunds are to be returned through the payment processing system for the ultimate benefit of the merchant and not the acquirer, such as FDMS.

38.     Similarly, the MasterCard "Chargeback Guide" (8 December 2015) ("MC CG") (copy annexed hereto as Exhibit H), documents procedural requirements for each stage of the chargeback process.   Section 4.1 of the MC CG states that "Single Message System [used by MasterCard to process financial transactions] "will process a reversal transaction for the amount of the exception *which will transfer the disputed funds between the two parties*" in the event of a chargeback.   *Id*. (emphasis added).   The reference to "parties" in the chargeback context is plainly a reference to the merchant and the cardholder, the parties to the dispute regarding the credit charge.   No language in the MC CG suggests that any part of the funds is to be paid to the acquirer.

39.     While acquirers, such as FDMS, are responsible for setting chargeback policies and procedures in compliance with the MC CG, and handling the processing of the chargebacks

18

for its merchants, the MC CG requires that such funds be transferred "between the two parties" (*i.e.*, the merchant and the cardholder).

## FDMS HAS BREACHED THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

**A.    The Agreement Between FDMS and Plaintiff Contains No Provision for the Retention of Interchange and Card Brand Fees Refunded by The Card Issuers and Card Brands.**

40.    The express terms of the Agreement between FDMS and Plaintiff provides that FDMS's fees are limited to those paid "[i]n consideration of the Services provided by us . . . [as] *set forth in this Agreement* (for purposes of clarity, this includes the Application and any additional pricing supplements or subsequent communications) . . . ."  Ex. F, § 18.1, p. 14 (emphasis added).  The Agreement, however, is silent as to the treatment of Interchange and Card Brand Fees refunded by Card Issuers and Card Brands where a sales transaction is reversed due to a customer refund or a chargeback.

41.    The Application executed by Plaintiff provides only that Plaintiff will pay a 2.69% discount rate for MasterCard, Visa and Discover sales transactions, plus additional fees as specified. Ex. B at 3, 4 of 13.  The heading which appears above the substantive provision of the Application reads "Discount Fees (Based on Gross Transaction Volume)":

| SMS(TCK)1405 | (7) FLAT RATE / IC PLUS / TIER PRICING SCHEDULE (cont'd) | | | | SMS(TCK)CorpFee1502 |
|---|---|---|---|---|---|
| **Discount Fees** (Based On Gross Transaction Volume) | | | | | |
| Accept **all** MasterCard, Visa and Discover Network Transactions (presumed, unless any selections below are checked) | | | | | MC/Visa/Discover Network IC Pass Thru You will be charged the applicable Interchange rate from MC (504), Visa (542), or Discover Network (527), plus a MC Assessment Fee (773) of 0.11% (MC Assessment Tran Amt >=\$1K (237), an additional 0.025% will be charged per MC settled credit card sale when the transaction amount equals \$1,000 or greater), a Visa Assessment Fee (274) of 0.11%, or a Discover Network Assessment Fee (234) of 0.10%, plus any other fees indicated on this Service Fee Schedule. |
| **MasterCard Acceptance**<br>☐ Accept MC Credit transactions _only_<br>☐ Accept MC Non-PIN Debit trans. _only_ | **Visa Acceptance**<br>☐ Accept Visa Credit transactions _only_<br>☐ Accept Visa Non-PIN Debit trans. _only_ | | **Discover Network Acceptance**<br>☐ Accept Discover Network Credit transactions _only_<br>☐ Accept Discover Network Non-PIN Debit trans. _only_ | | |
| See Section 1.9 of the Program Guide for details regarding limited acceptance. You are responsible for distinguishing Credit from Non-PIN Debit Cards. Even if you have agreed to limit your acceptance of certain cards as outlined above, you must continue to accept all foreign issued cards, whether Credit or Non-PIN Debit. If you agree to limit your acceptance to a particular type of card and, whether intentionally or in error, accept another type of transaction, the resulting transaction will downgrade to the highest cost interchange plus the applicable Non-Qualified Surcharge (See Section 18.1 of the Program Guide). | | | | | |
| **Pricing Method:** (Select One) | MC/Visa/ Discover Network 2-Tier | MC/Visa/ Discover Network 3-Tier | **Transaction Fees** (Applies to MC/Visa/Discover Network 2-Tier ONLY) | MC/Visa/Discover Network/ American Express Discount Rate | |
| **QUALIFIED DISCOUNT RATES** | | | | | |
| MC/Visa/Discover Network Credit Discount Rate   (800, 904, 1705) | % | % | Trans Fee   (501,902,905,906) (915,916) \$ | **2.69** % | % |
| American Express OnePoint** Credit Discount Rate   (Key 0-570) | | | | **2.89** % | |
| MC/Visa/Discover Network Non-PIN Debit Discount Rate   (850, 954, 964) | % | % | MC/Visa/Discover Network Non-PIN Debit Trans Fee   (130,131,134,135) (187,788) \$ | **2.69** % | % |
| **NID-QUALIFIED DISCOUNT RATES** (Does not apply to MC / Visa/Discover 2 Tier) | | | | | |
| MC/Visa/Discover Network | | | MC /V/Discover Network Mid-Qual Credit | | |

_Id._ at 4 of 13.  The Program Guide provides that "Gross: When referred to in connection with transaction amounts or fees, _refers to the total amount of Card sales_, without set-off for any refunds or Credits" (Ex. F at 28 of 55) (emphasis added).  The plain language of that definition states that it applies only to _sales_, and not to other types of transactions (such as returns initiated by the merchant or chargebacks).  Moreover, the heading relating to Discount Fees is not a substantive provision of the Agreement.

42.     Section 37.4 of the Program Guide expressly states "Headings. The headings contained in this Agreement are for convenience of reference only and shall _not in any way affect the meaning or construction of any provision of this Agreement_."  Ex. F, p. 26 (emphasis added).[6]  Absent a substantive relevant provision of the Agreement, this _heading_ provides no contractual authority for FDMS to retain refunds of Interchange and Card Brand Fees by the Card Issuers and Card Brands.

43.     Moreover, FDMS, itself, does not construe the "Discount Fees" header to constitute a substantive provision of the Agreement. As is apparent from the part of the

---

[6]  The Program Guide further provides that "[t]his Program Guide, your Merchant Processing Application and the schedules thereto" constitute the "Agreement." Ex. F at 2 of 55.

Application reproduced above, the "Discount Fee" heading also applies to the section of the Application that relates to the interchange pass-through pricing option labeled as the "MC/Visa/Discover Network IC Pass Thru" pricing plan (the "IC Pass Thru").  Ex. B at 4 of 13. FDMS, however, pays merchants utilizing IC Pass Thru pricing the Interchange and Card Brand Fees refunded by the Card Issuers and the Card Brands where there has been a reversal of a sales transaction, such as a customer refund or chargeback.  Therefore, this heading and the word "Gross" used therein, cannot be justification for retaining refunded Interchange and Card Brand Fees under either merchant pricing model.

44.    In fact, the definition of "Gross" contained in the Program Guide has only one substantive meaning in the Agreement: it relates to tax reporting to the Internal Revenue Service. *See* Ex. F, § 1.61, p. 48 ("Pursuant to Section 6OS0W of the Internal Revenue Code, merchant acquiring entities and third party settlement organizations are required to file an information return for each calendar year beginning January 1, 2011 reporting all payment card transactions and third party network transactions with payees occurring in that calendar year.  Accordingly, you will receive a Form 1099 reporting your *gross transaction amounts* for each calendar year beginning with transactions processed in calendar year 2011.") (emphasis added).  Given that this language substantively applies only to tax reporting, it provides no authority for the retention by FDMS of refunds issued by Card Issuers or Card Brand.

45.    Section 8 of the Application, entitled "Refunds/Exchanges (Credits)," contains no mention of Interchange or Card Brand Fees refunded by the Card Issuer or Card Brand, let alone any authority for FDMS to retain such refunds.  *See* Ex. F, p. 10.  Nor does § 8 of the Application indicate that a refund to a cardholder will result in the imposition of additional fees by FDMS.

21

46.     Likewise, § 10 of the Application, "Chargeback, Retrieval and Other Credits," contains no mention of Interchange or Card Brand Fees refunded by the Card Issuer or Card Brand, let alone any authority to retain such refunds.  *See* Ex. F, pp. 11-13.  Nor does § 10 of the Application indicate that a chargeback will result in the imposition of additional fees imposed by FDMS.  Instead, § 10 describes only fees that may be imposed by Visa, MasterCard, Discover and American Express.  *See* Ex. F, p. 11.

47.     By way of comparison, unlike FDMS, American Express (which serves as acquirer, Card Brand and Card Issuer) expressly informs merchants in its merchant guidelines that it does not refund the discount fees or any other fees or assessments, including the Interchange Fee, in the event of a transaction reversal: "If you issue a Credit, *we will not refund the Discount or any other fees* or assessments previously applied on the corresponding Charge." American Express Merchant Reference Guide – U.S. (August 2016) (copy annexed hereto as Exhibit J), § 4.7, p. 23.  Had FDMS intended for its Agreement to provide it with contractual authority to retain the refunded Interchange and Card Brand Fees to merchants utilizing the discount pricing plan, like American Express, it could have expressly stated that in the Agreement.

48.     Plaintiff's Card Processing Statement for the period February 1, 2013 to February 28, 2013 shows a credit sales reversal of $35.24.  *See* Exhibit E at 4 of 6.

**AMOUNTS SUBMITTED BY BATCH**

| Date Submitted | Batch Submitted | MasterCard | Visa | Total Submitted |
|---|---|---|---|---|
| 02/05/13 | 830540050056 | $263.28 | 0.00 | $263.28 |
| 02/06/13 | 830540060057 | $557.60 | 0.00 | $557.60 |
| 02/12/13 | 830540120058 | 0.00 | $48.00 | $48.00 |
| 02/14/13 | 830540140059 | $250.00 | 0.00 | $250.00 |
| 02/15/13 | 830540150060 | 0.00 | $318.12 | $318.12 |
| 02/18/13 | 830540180061 | 0.00 | $226.03 | $226.03 |
| 02/19/13 | 830540190062 | -$35.24 | $1,000.00 | $964.76 |
| 02/26/13 | 830540260063 | 0.00 | $714.00 | $714.00 |
| | Sub Totals | $1,035.64 | $2,306.15 | $3,341.79 |
| **Total** | | | | **$3,341.79** |

*Id*. That transaction reversal was caused by a customer return and merchant refund issued in connection with a previous MasterCard card purchase on February 14, 2013.

49.     The February Statement, however, does not show any entry in "Adjustments" or debits in "Fees Charged" that indicate that the Interchange Fee, Card Brand Fee or any other processing fee had been refunded to Plaintiff, or retained by FDMS, in connection with reversal of that $35.24 credit transaction:

**ADJUSTMENTS**

| Date | Description | Amount |
|---|---|---|
| | No Adjustments for this Statement Period | |
| **Total** | | **0.00** |

**FEES CHARGED**

| Date | Type | Description | Total |
|---|---|---|---|
| 01/31/13 | IC | JAN BB193-TRANS CLEARED AS COMM CARD ELEC - TAX EXEMPT ENH VI          3 | -1.53 |
| 02/28/13 | SC | MASTERCARD CREDITS TRANS FEE          1 TRANSACTIONS AT     .200000 | -0.20 |
| 02/28/13 | FEE | VISA NETWORK FEE CNP 2-03 | -5.00 |
| 02/28/13 | IC | VISA ACCESS FEE          6 TRANSACTIONS AT    .031500 | -0.19 |
| 02/28/13 | SC | MASTERCARD SALES DISCOUNT .026900 DISC RATE TIMES          $807.60 | -21.72 |
| 02/28/13 | FEE | MASTERCARD AUTH FEE          3 TRANSACTIONS AT     .200000 | -0.60 |
| 02/28/13 | IC | MASTERCARD ACCESS FEE          3 TRANSACTIONS AT     .031500 | -0.09 |
| 02/28/13 | SC | VISA SALES DISCOUNT .026900 DISC RATE TIMES     $2,038.03 | -54.82 |
| 02/28/13 | FEE | VISA AUTH FEE          6 TRANSACTIONS AT     .200000 | -1.20 |
| 02/28/13 | SC | MC LICENSE VOLUME FEE .000190 DISC RATE TIMES     $1,070.88 | -0.20 |
| 02/28/13 | FEE | VISA INTL SERVICE FEE          3 TRANS TOTALING     $1,940.03 | -12.61 |

Ex. E at 4 of 6.  Likewise, the Benex LC Card Processing Statement (03/01/13 – 03/31/13) issued to Plaintiff by FDMS for March 2013 ("March Statement") (copy annexed hereto as Exhibit K) at  4 of 7, shows no entries in "Adjustments" or debits in "Fees Charged" that indicate

23

that the Interchange Fee, Card Brand Fee or any other processing fee had been refunded to Plaintiff, or retained by FDMS, in connection with reversal of that $35.24 credit transaction:

| ADJUSTMENTS | | |
|---|---|---|
| Date | Description | Amount |
| | No Adjustments for this Statement Period | |
| **Total** | | **0.00** |

| FEES CHARGED | | | |
|---|---|---|---|
| Date | Type | Description | Total |
| 02/28/13 | IC | FEB BB076-TRANSACTION CLEARED AS ENHANCED VALUE FOR SML BUS MC          1 | -1.55 |
| 02/28/13 | IC | FEB BB193-TRANS CLEARED AS COMM CARD ELEC - TAX EXEMPT  ENH VI          1 | -0.33 |
| 02/28/13 | IC | FEB BB272-TRANSACTION CLEARED AT INTERREGIONAL COMMERCI COM VI          1 | -5.97 |
| 03/31/13 | SC | MASTERCARD SALES DISCOUNT .026900 DISC RATE TIMES          $400.00 | -10.76 |
| 03/31/13 | FEE | VISA NETWORK FEE CNP 2-04 | -7.00 |
| 03/31/13 | SC | VISA SALES DISCOUNT .026900 DISC RATE TIMES          $750.00 | -20.18 |
| 03/31/13 | FEE | MASTERCARD AUTH FEE          1 TRANSACTIONS AT     .200000 | -0.20 |
| 03/31/13 | SC | MC LICENSE VOLUME FEE .000190 DISC RATE TIMES          $400.00 | -0.08 |

50.    Instead, FDMS improperly retained the Interchange and Card Brand Fees associated with $35.24 transaction.  The refunded fee activity is completely invisible to the Plaintiff.  Further, because no substantive provision of the Agreement expressly provides that FDMS had any right to retain and fail to return to Plaintiff the Interchange and Card Brand Fees refunded by the Card Brands (2.21% of the transaction (Ex. D, Interrogatory Answer #5 at 12)), FDMS was not authorized to do so.

51.    Accordingly, Plaintiff and other members of the Class who did not receive the fees refunded by the Card Issuers and Card Brands that were improperly retained by FDMS, were injured thereby.  Plaintiff – who made no money on the February 14, 2013 transaction due to the reversal of that sale – has, therefore, paid FDMS for services that were never received. This contravenes the express terms of the Agreement that provides that FDMS's fees are limited to those paid "[i]n consideration of the Services provided by us . . . .  Ex. F, § 18.1, p. 14. Further, the failure to remit the Interchange and Card Brand Fee refunds to Plaintiff and the other members of the Class *results in a windfall to FDMS, whereby it is compensated more in the*

24

*context of a reversed transaction (for which it no longer has any risk) than it was in the original sales transaction.*   In the case of Plaintiff, FDMS's revenue on the original sales transaction was approximately .48% (the difference between the 2.21% refunded by the Card Brand and FDMS's 2.69% discount rate).   On the reversed transaction, FDMS kept the full 2.69%, which is approximately *five and one-half times more than it made on the original transaction*.

### B.    FDMS Did Not Apprise Merchants that Interchange and Card Brand Fees Were Refunded Upon Sales Transaction Reversal.

52.    As evident from Plaintiff's February and March 2013 Statements, FDMS did not apprise Plaintiff that the Card Brand had refunded the Interchange and Card Brand Fees in connection with the reversal of the February 14, 2013 sales transaction, nor did FDMS indicate that it was retaining the refunded Interchange and Card Brand Fees.  *See* Exs. J, K.

53.    FDMS's failure to notify Plaintiff of that refund amounting to 2.21% of the sales transaction and its failure to notify Plaintiff that it was retaining such amounts, as well as the lack of any contractual provision expressly indicating that FDMS retained fees refunded by the Card Issuers and Card Brands (regardless of whether merchants were utilizing the discount pricing plan or the interchange pass-through pricing plan) prevented from Plaintiff from knowing that it was entitled payment of the refunded fees and precluded it from providing notice to FDMS as required by § 18.10 of the Agreement.  Ex. F, p. 14. While plaintiff was obviously aware that it had not received the refunded fees, it was unaware that FDMS had received those refunded fees and, therefore, was unaware that it had the opportunity to contest FDMS's failure to pay the refunded fees to Plaintiffs.

**C.    FDMS Improperly Imposed the Same Fee Twice on Reversed Sales Transactions.**

54.    FDMS imposes the same charge twice on merchants utilizing the discount rate pricing plans in the event of refunds or chargebacks.  Upon the credit card sale, FDMS imposes a "MC/V/Discover Network Auth & Ret Trans Fee" for each transaction.   If a transaction is reversed, FDMS again charges the merchant a second MC/V/Discover Network Auth & Ret Trans Fee.  While shown as a single fee in the Application (Exhibit B at 4 of 13), it is identified as two different and distinctly entitled fees on merchant account statements,namely as the "MASTERCARD AUTH FEE" and the "MASTERCARD CREDITS TRANS FEE":

| FEES CHARGED | | | |
|---|---|---|---|
| Date | Type | Description | Total |
| 01/31/13 | IC | JAN BB193-TRANS CLEARED AS COMM CARD ELEC - TAX EXEMPT  ENH VI      3 | -1.53 |
| 02/28/13 | SC | MASTERCARD CREDITS TRANS FEE       1 TRANSACTIONS AT    .200000 | -0.20 |
| 02/28/13 | FEE | VISA NETWORK FEE CNP 2-03 | -5.00 |
| 02/28/13 | IC | VISA ACCESS FEE       6 TRANSACTIONS AT    .031500 | -0.19 |
| 02/28/13 | SC | MASTERCARD SALES DISCOUNT .026900 DISC RATE TIMES     $807.60 | -21.72 |
| 02/28/13 | FEE | MASTERCARD AUTH FEE       3 TRANSACTIONS AT    .200000 | -0.60 |
| 02/28/13 | IC | MASTERCARD ACCESS FEE       3 TRANSACTIONS AT    .031500 | -0.09 |
| 02/28/13 | SC | VISA SALES DISCOUNT .026900 DISC RATE TIMES     $2,038.03 | -54.82 |
| 02/28/13 | FEE | VISA AUTH FEE       6 TRANSACTIONS AT    .200000 | -1.20 |
| 02/28/13 | SC | MC LICENSE VOLUME FEE .000190 DISC RATE TIMES     $1,070.88 | -0.20 |
| 02/28/13 | FEE | VISA INTL SERVICE FEE .000190 DISC RATE TIMES     $1,940.03 | -12.61 |

PO BOX 6600 HAGERSTOWN, MD 21740-0000

Exhibit E at 4 of 6.   Nowhere in the FDMS agreements with its merchants does FDMS indicate that the MC/V/Discover Network Auth & Ret Trans Fee, or indeed any fee, is imposed for reversed sales transactions.

55.    Moreover, because they are shown as two separate fees on the account statements, Plaintiff do not, and could not, know that it was assessed the same fee twice in connection with reversed transactions.   Accordingly, merchants, like Plaintiffs were precluded from providing notice to FDMS as required by § 18.10 (Ex. F, p. 14) of the Agreement regarding the multiple imposition of that fee.

56.     Section 8 of the Application, entitled "Refunds/Exchanges (Credits)," contains no mention of the imposition of additional fees by FDMS where a sales transaction has been reversed and a refund issued to a card holder.  *See* Ex. F, p. 10.

57.     Likewise, § 10 of the Application, "Chargeback, Retrieval and Other Credits," contains no mention that a chargeback will result in the imposition of additional fees imposed by FDMS.  Instead, § 10 describes only fees that may be imposed by Visa, MasterCard, Discover and American Express.  *See* Ex. F, pp. 11-13.

58.     Absent any contractual provision authorizing the assessment of any fee, let alone the same fee as had already been charged on the initial sales transaction, on the reversal of a sales transaction, FDMS has breached the covenant of good faith and fair dealing implied in its agreements with plaintiff and the members of the Class.

## FDMS BREACHED THE AGREEMENTS WITH MASTERCARD UNDER WHICH MERCHANTS ARE THIRD PARTY BENEFICIARIES

59.     Acquirers, like FDMS, are licensed with MasterCard to permit it to process merchant transactions made with MasterCard, Maestro and Cirrus brand credit and debit cards. The activity of acquirers and merchants is governed by the MC Rules (Ex. A, pp. 10, 203) and the MC TPR.  Ex. C, p. 3.  *See also* FDC Annual Report, filed with the United States Securities and Exchange Commission on Form 10-K on February 25, 2016 ("2016 Form 10-K") (http://www.sec.gov/Archives/edgar/data/883980/000162828016011729/a12311510-k.htm,   last viewed on April 15, 2016) at 16 ("We are subject to rules of MasterCard, Visa, INTERAC, PULSE, and other payment networks. In order to provide processing services, a number of our subsidiaries are registered with Visa and/or MasterCard as service providers for member institutions. Various subsidiaries of ours are also processor level members of numerous debit and

27

electronic benefits transaction networks or are otherwise subject to various network rules in connection with processing services and other services we provide. As such, we are subject to applicable card association, network, and national scheme rules . . . ."). The license agreements between acquirers, such as FDMS, and MasterCard, along with the applicable rules, comprise valid enforceable contracts between acquirers and MasterCard.

60.     As noted above, Section 5.3 of the MC Rules provides that "[a]n Acquirer must fulfill all of the obligations set forth in this Rule 5.3 with respect to each of its Merchants."  Ex. A at 79.   The MC Rules further obligate acquirers to pay merchants the amount of all transactions that the acquirer acquires from the merchant.  *Id*.  The MC Rules, therefore, establish that merchants are intended third party beneficiaries of the agreements between MasterCard and acquirers, such as FDMS.

61.     The MC TPR, in the "Corrections" section states that "[a] correction must be performed as a Card-read Transaction initiated by or on behalf of the Cardholder with either PIN or signature as the Cardholder verification method.  The Acquirer assumes the risk for this message type and *the interchange fee is returned to the Acquirer from the Issuer*."  Ex. C at 48 (emphasis added).  Likewise, the MC TPR further provides that "[t]he proportional interchange fee associated with the original POS Transaction *is reversed* in the refund Transaction."  *Id*. at 88 (emphasis added).

62.     The use of the term "reversed" shows that MC TPR clearly contemplates that the interchange fee associated with the original transaction will be returned, via the acquirer, to the merchant.  Because the interchange fee on the original transaction is deducted by the acquirer and then forwarded by the acquirer to the Card Brand, here MasterCard, such fees are simply sent back through the same conduit through which they were paid, namely through the acquirer.

63.     Notably, the MC Merchant Guide "provides guidelines and best practices for merchants in the U.S. region that accept MasterCard cards" (Ex. I at 1-1), defines "refund" as the "[o]pposite of a purchase transaction, namely, the cardholder returns goods to the merchant and is credited for their value.  *Positive interchange and merchant service charge are reversed*") (emphasis added).  This definition shows that the agreements between MasterCard and acquirers, such as FDMS, require that the Interchange and Card Brand Fee refunds are to be returned through the payment processing system for the ultimate benefit of the merchant and not the acquirer, here FDMS.

64.     Similarly, the MasterCard "Chargeback Guide" (8 December 2015) ("MC CG") (copy annexed hereto as Exhibit H), documents procedural requirements for each stage of the chargeback process.  Section 4.1 of the MC CG states that "Single Message System [used by MasterCard to process financial transactions] "will process a reversal transaction for the amount of the exception *which will transfer the disputed funds between the two parties*" in the event of a chargeback.  *Id*. (emphasis added).  The reference to "parties" in the chargeback context is plainly a reference to the merchant and the cardholder, the parties to the dispute regarding the credit charge.  No language in the MC CG suggests that any part of the funds is to be retained by the acquirer.

65.     FDMS breached its agreement with MasterCard by failing to remit refunded Interchange and Card Brand Fees (amounting to 2.21% of the initial sales transaction) to Plaintiff in connection with the February 19, 2013 reversal of Plaintiff's February 14, 2013 sales transaction as alleged above (¶¶ 12, 48-50), and by failing to remit refunded Interchange and Card Brand Fees to other members of the Class where sales transactions have been reversed. Further, the failure to remit the Interchange and Card Brand Fee refunds to Plaintiff and the other

29

members of the Class, this breach results in a windfall to FDMS, whereby it is compensated more in the context of a reversed transaction (for which it no longer has any risk) than it was in the original sales transaction. In the case of Plaintiff, FDMS's revenue on the original sales transaction was approximately .48% (the difference between the 2.21% refunded by the Card Brand and FDMS's 2.69% discount rate). On the reversed transaction, FDMS kept the full 2.69%, which is approximately *five and one-half times more than it made on the original transaction.*

66.     As the MC Rules and MC TPR impose affirmative obligations upon the acquirers, such as FDMS, with regard to the merchants engaging in transactions with MasterCard brand cardholders[7] (Ex. A, p. 79), Plaintiff and the other members of the Class are third party beneficiaries of the agreements between FDMS and MasterCard.

67.     FDMS is, therefore, liable to Plaintiff and the Class for the breach of its agreements with MasterCard resulting from FDMS's failure to remit the Interchange and Card Brand Fees refunded due to the reversal of sales transactions caused by cardholder refunds and/or chargebacks, and Plaintiffs and the Class were injured thereby.

## FIRST CAUSE OF ACTION

**(On Behalf of Plaintiff and the Class Against FDMS for
Breach of the Implied Covenant of Good Faith and
Fair Dealing Under New York Law)**

68.     Plaintiff repeats and realleges all of the foregoing paragraphs as though fully set forth herein.

---

[7] This includes MasterCard, Maestro and Cirrus brand credit and debit cards.

69.     As described above, Plaintiff and all other members of the Class entered into one or more contracts with FDMS for MasterCard credit and debit card payment processing services.

70.     Other than their particular discount rates, each of these contracts contains and contained substantially similar terms and conditions.  FDMS failed to pay to merchants who utilized the discount pricing option Interchange and Card Brand Fees that had been refunded by the Card Issuers and/or Card Brands upon reversal of a sales transaction due to a merchant-issued refund to a cardholder or a chargeback.

71.     None of these contracts contained terms addressing the processing of Interchange Fees or Card Brand Fees refunded by MasterCard pursuant to their regulations and rules in conjunction with merchant-issued credit refunds and chargebacks by Card Issuers.  Further, none of these contracts contained terms permitting the imposition of fees upon reversal of a sales transaction.

72.     Under New York law, all contracts imply a covenant of good faith and fair dealing in the course of performance.  The implied covenant is breached when a party to the contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement.

73.     Interchange Fees and Card Brand Fees are not collected for the benefit of FDMS, and it has no claim to such amounts.  Interchange Fees and Card Brand Fees are charged to merchants, and such fees should be returned to merchants when they are refunded by Card Issuers through Card Brand networks to FDMS as a result of merchant-issued credit refunds and chargebacks by Card Issuers.  Similarly, the refunded Interchange and Card Brand Fees must be returned to the merchant by FDMS in connection with a chargeback or any merchant-issued refund because FDMS performed no services entitling it to retain such fees, nor have FDMS, the

Card Brands or the Card Issuers incurred any payment risk in connection with such returned transactions. The failure to remit the Interchange and Card Brand Fee refunds to Plaintiff and the other members of the Class *results in a windfall to FDMS, whereby it is compensated more in the context of a reversed transaction (for which it no longer has any risk) than it was in the original sales transaction.* In the case of Plaintiff, FDMS's revenue on the original sales transaction was approximately .48% (the difference between the 2.21% refunded by the Card Brand and FDMS's 2.69% discount rate). *On the reversed transaction, FDMS kept the full 2.69%, which is approximately five and one-half times more than it made on the original transaction. It is precisely this kind of incongruous and unfair result that the implied covenant of good faith and fair dealing is meant to prevent.* Finally, FDMS has no authority to charge the merchant a fee on the reversal of a sales transaction.

74.     FDMS, therefore, breached the implied covenant of good faith and fair dealing by failing to remit Interchange and Card Brand Fee refunds to merchants in the event of a merchant-issued refund or chargeback, and retaining them instead, and by further charging merchants a fee on the reversal of the sales transaction.

75.     This breach of the implied covenant of good faith and fair dealing is compounded by the failure of FDMS to advise its merchants that it receives and retains Interchange and Card Brand Fee refunds, and that it charges an additional fee on reversal of sales transactions.

76.     FDMS has injured the rights of Plaintiff and all other members of the Class to receive the fruits of their contracts and has improperly denied them their funds, the amount of such damages to be determined at trial.

77.     As a consequence of the foregoing, FDMS is liable to Plaintiff and all other members of the Class.

## SECOND CAUSE OF ACTION

**(On Behalf of Plaintiff and the Class Against FDMS for
Breach of Contract to Which Plaintiff and the Class
are Third Party Beneficiaries Under New York Law)**

78.     Plaintiff repeats and realleges all of the foregoing paragraphs as though fully set forth herein.

79.     As described above, FDMS entered into licensing agreements with MasterCard, which include the MC Rules and the MC TPR.

80.     MasterCard performed all, or substantially all, of its responsibilities under the contracts, including refunding to FDMS Interchange and Card Brand Fees paid by merchants for sales transactions subsequently reversed due to merchant-issued refunds to MasterCard cardholders and/or chargebacks.

81.     FDMS materially breached its contracts with MasterCard by failing to "reverse" the initial sales transaction by remitting the refunded Interchange and Card Brand Fees to Plaintiff and the Class, and instead retained such refunded fees. The failure to remit the Interchange and Card Brand Fee refunds to Plaintiff and the other members of the Class ***results in a windfall to FDMS, whereby it is compensated more in the context of a reversed transaction (for which it no longer has any risk) than it was in the original sales transaction.*** In the case of Plaintiff, FDMS's revenue on the original sales transaction was approximately .48% (the difference between the 2.21% refunded by the Card Brand and FDMS's 2.69% discount rate).  On the reversed transaction, FDMS kept the full 2.69%, ***which is approximately five and one-half times more than it made on the original transaction.***

33

82.     Plaintiff and the members of the Class, as merchants that accept MasterCard brand credit and/or debit cards for payment in exchange for goods and services, and utilize FDMS's payment processing services, are third party beneficiaries under the agreements between FDMS and MasterCard.

83.     As a consequence of FDMS's breach of its agreements with MasterCard, Plaintiffs and the Class were deprived of the benefits intended for them under the terms of the agreements between FDMS and MasterCard, and Plaintiffs and the members of the Class were injured thereby.

84.     As a consequence of the foregoing, FDMS is liable to Plaintiffs and all other members of the Class, the amount of such damages to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and the members of the Class, demands a jury trial and judgment as follows:

A.     For an order certifying this case as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(3) and appointing Plaintiff Benex and its counsel to represent the Class;

B.     Restitution of all such Interchange Fee refunds, Card Brand Fee refunds, and fees paid to FDMS in connection with the reversal of sales transactions to Plaintiff and the members of the Class as a result of the wrongs alleged herein, within applicable statutes of limitations, in an amount to be determined at trial;

C.     Disgorgement of any other ill-gotten gains derived by FDMS from the wrongs alleged herein;

D.     Actual damages in an amount according to proof;

34

E.  Reasonable attorneys' fees and nontaxable costs to the extent allowed by law;

F.  Pre-judgment interest at the highest rate permitted by law; and

G.  Such other and further relief as the Court deems just and proper.


Dated:  April 15, 2016                    **RIGRODSKY & LONG, P.A**

By: _Timothy J. MacFall_
Seth D. Rigrodsky
Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone:  (516) 683-3516
Facsimile:  (302) 654-7530
sdr@rigrodskylong.com
tjm@rigrodskylong.com

*Attorneys for Plaintiff Benex LC*

35

**CERTIFICATE OF SERVICE**

I hereby certify that on this, the 15th day of April, 2016 a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Timothy J. MacFall*
Timothy J. MacFall