UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
BENEX LC, on behalf of itself and
all others similarly situated,

                          Plaintiff,        <u>MEMORANDUM & ORDER</u>
                                            14-CV-6393(JS)(AKT)

          -against-

FIRST DATA MERCHANT SERVICES
CORPORATION,

                          Defendant.
------------------------------------X
APPEARANCES
For Plaintiff:      Seth Rigrodsky, Esq.
                    Rigrodsky & Long, P.A.
                    919 North Market Street, Suite 980
                    Wilmington, Delaware 19801

                    Timothy J. MacFall, Esq.
                    Rigrodsky & Long, P.A.
                    585 Stewart Avenue, Suite 304
                    Garden City, New York 11530

For Defendant:      Noah Adam Levine, Esq.
                    Alan E. Schoenfeld, Esq.
                    Wilmer Cutler Pickering Hale and Dorr LLP
                    7 World Trade Center
                    250 Greenwich Street
                    New York, New York 10007

                    Albinas Prizgintas, Esq.
                    Wilmer Cutler Pickering Hale and Dorr LLP
                    1875 Pennsylvania Avenue NW
                    Washington, D.C. 20006

                    David C. Marcus, Esq.
                    Wilmer Cutler Pickering Hale and Dorr LLP
                    350 South Grand Avenue, Suite 2100
                    Los Angeles, California 90071

SEYBERT, District Judge:

This case involves a contract between Benex LC ("Benex" or "Plaintiff"), a merchant, and First Data Merchant Services Corporation ("First Data" or "Defendant"), a payment processor, for processing credit card and debit card transactions. Currently pending before the Court is First Data's motion to dismiss the Amended Complaint for failure to state a claim. (Def.'s Mot., Docket Entry 34.) For the following reasons, First Data's motion is GRANTED.

BACKGROUND

I.  Factual Background[1]

The Court assumes familiarity with the factual background of this case, which is set forth in its Memorandum and Order dated March 16, 2016. See Benex LC v. First Data Merchant Servs. Corp., No. 14-CV-6393, 2016 WL 1069657 (E.D.N.Y. Mar. 16, 2016).

Benex is a merchant that accepts credit and debit cards, and First Data is a payment processor that facilitates credit and

---

[1] The following facts are taken from the Amended Complaint (Am. Compl., Docket Entry 25) and are presumed to be true for the purposes of this Memorandum and Order. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572, 127 S. Ct. 1955, 1975, 167 L. Ed. 2d 929 (2007) ("[A] judge ruling on a defendant's motion to dismiss a complaint must accept as true all of the factual allegations contained in the complaint." (internal quotation marks and citation omitted)).

debit card transactions. (Am. Compl. ¶¶ 2, 20.) In March 2012, Benex and First Data entered into a contract for payment processing services, in which First Data would "perform various processing functions associated with card transactions such as authorizations, batching, clearing, and settlement" (the "Contract").[2] (Am. Compl. ¶ 2; see Contract, Am. Compl. Ex. B, Docket Entry 25-2.) Benex alleges that First Data has failed to refund "interchange fees," "dues and assessments" and "network access fees" to merchants such as Benex. (Am. Compl. ¶ 1.)

In most credit or debit card transactions, six parties are involved: (1) the customer, (2) the issuing bank, (3) the merchant, (4) the payment processor, (5) the acquiring bank, and (6) the network (i.e., Visa, MasterCard, or Discover (collectively, the "Card Brands")). The issuing bank issues a credit or debit card to a customer, who uses it to purchase goods or services from a merchant like Benex. (See Am. Compl. ¶¶ 2, 20.) The acquiring bank is the "bank that does business with [the]

---

[2] The Contract incorporates First Data's Program Terms and Conditions (the "Program Guide") by reference. (Contract at 14 ("Client further acknowledges reading and agreeing to all terms in the Program Guide, which shall be incorporated into Client's Agreement.").) The Program Guide details the parties' obligations and defines the majority of the Contract terms. (Program Guide, Section 38, Am. Compl. Ex. F, Docket Entry 25-6); see also Payments Indus. Glossary ("Glossary"), Am. Compl. Ex. G, Docket Entry 25-7 (defining various industry terms).)

merchants[.]"³   (Glossary at 3.)   First Data, the payment processor, "make[s] it possible for merchants to accept credit and debit card payments from their customers."   (Am. Compl. ¶ 2.) First Data submits the transaction to the network for authorization, and the transaction is routed to the issuing bank. (See Am. Compl. ¶ 2.)  The network then requests that the issuing bank authorize or decline the transaction.  If the transaction is approved, the issuing bank transmits the funds to the acquiring bank, which credits the merchant's account.⁴ Before crediting the merchant's account, the acquirer deducts various fees incurred during processing, including a fee paid to the issuing bank to process the transaction (the "Interchange Fee") and fees paid to the Card Brands known as "dues and assessments" and "network access fees" (the "Card Brand Fees").  (Am. Compl. ¶¶ 5-6.)

First Data, as the payment processor, receives a fee for its services from merchants such as Benex.  (Am. Compl. ¶ 9.) Merchants have two pricing options.  The first is a discount rate

---

³ The Court will use the pagination utilized by the Electronic Case Filing System when referring to the Exhibits.
⁴ Ramon P. DeGennaro, 91 Fed. Reserve Bank of Atlanta Econ. Rev. 27 (2006), at 32-33, available at https://www.frbatlanta.org/-/media/Documents/research/publications/economic-review/2006/vol91no1_degennaro.pdf?la=en ("The processor's system reads the information and sends the authorization request to the specific issuing bank through the card network.  The issuing bank . . . either grant[s] or den[ies] authorization.  The [acquiring bank] receives the response and relays it to the merchant.")

option (the "Discount Rate"), which charges merchants either a percentage rate or a specified amount to process all of its "qualifying daily Credit Card and Non-PIN Debit Card transactions . . . ." (Program Guide at 29.) The second option is an interchange-plus option, also referred to as IC Pass Thru, (the "Interchange-Plus Option") pursuant to which First Data charges the merchant for the actual Interchange Fees incurred for each transaction, plus a markup. (Contract at 5.)

Benex selected the Discount Rate, which is 2.69% for the Card Brands.[5] (See Am. Compl. ¶ 20; Contract at 5.) The Discount Rate is "[b]ased on [G]ross Transaction Volume." (Contract at 5.) The Program Guide defines "Gross" as "refer[ing] to the total amount of Card sales, without set-off for any refunds or Credits." (Program Guide § 38 at 29 (emphasis added).)

In addition, the Contract contains what appears to be a notice of claim provision. (See Contract ¶ 4 at 14.) Under the Contract, Benex agreed to "promptly and carefully review statements or reports . . . reflecting Card transaction activity." (Program Guide § 18.10 at 16.) Benex also agreed to notify First Data of any billing issues "within 60 days of the date where the charge or funding appears." (Contract ¶ 4 at 14; see also Program

---

[5] The Contract includes different columns for each pricing method. The Discount Rate column is the only one completed. (Contract at 5.)

Guide § 18.10 at 16 ("If you believe any adjustments should be made . . . you must notify us in writing within sixty (60) days after any debit or credit is or should have been effected . . . .").)  If Benex fails to do so, First Data "shall not have any obligation to investigate or effect any such adjustments." (Program Guide § 18.10 at 16.)

II.  <u>Procedural History</u>

Benex commenced this lawsuit on October 29, 2014, asserting three causes of action: (1) breach of the implied covenant of good faith and fair dealing, (2) conversion and (3) unjust enrichment.  (Compl., Docket Entry 1, ¶¶ 67-84.)  Benex offered two theories.  <u>First</u>, it alleged that First Data failed to return Interchange and Card Brand Fees, among others, when Benex provided refunds to its customers or when the Issuing Bank issued chargebacks.[6]  (<u>See</u>, <u>e.g.</u>, Compl. ¶¶ 1, 72.)  <u>Second</u>, it alleged that First Data improperly charged an "additional discount rate on . . . returned transaction[s]."  (Compl. ¶ 1 (internal quotation marks omitted).)  First Data moved to dismiss the Complaint, arguing that the terms of the Contract barred Benex's recovery, the conversion claim was duplicative, and the unjust enrichment

_____

[6] A "chargeback" is a "transaction that is challenged by a cardholder or card issuing bank and is sent back through interchange to the merchant bank for resolution."  (Glossary at 5.)

claim could not be maintained in light of the parties' Contract. (See Def.'s Br., Docket Entry 15, at 10-20.)

On March 16, 2016, this Court granted First Data's motion and dismissed Benex's conversion and unjust enrichment claims with prejudice. See Benex, 2016 WL 1069657, at *6. Specifically, the Court dismissed the conversion claim because "it [was] duplicative of its implied covenant claim," and held that "[the] unjust enrichment claim [was] barred by the existence of the Contract." Benex, 2016 WL 1069657, at *5-6. However, the Court dismissed Benex's implied covenant of good faith and fair dealing claim without prejudice and granted leave to replead. Id. at 6.

Because the Court's analysis of the implied covenant claim is relevant to the instant motion, a brief summary is necessary. In regard to Benex's first theory--that First Data breached the implied covenant of good faith and fair dealing by failing to refund Interchange and Card Brand fees--this Court held that "the Contract's plain terms bar[] Benex's recovery." Id. at *4. The Court explained that (1) "Benex agreed to pay the Discount Rate" for First Data's services, (2) the Discount Rate is "[b]ased on [G]ross Transaction Volume" and (3) the Program Guide, incorporated by reference into the parties' agreement, specifies that "gross" refers to the "total amount of Card Sales, without set-off for any refunds or Credits." (Id. (internal quotation marks and citations omitted) (alterations and emphasis in

original); see supra n. 2.) This Court also held that Benex's claim was barred because it failed to give notice pursuant to the notice of claim provision and specifically rejected Benex's argument that it could not have known that First Data was retaining these fees. Benex, 2016 WL 1069657, at *4. Benex's Complaint included excerpts from its Card Processing Statement for February 2013 which showed a credit reversal of $35.24, but the statement did not indicate any refund of the Interchange, Card Brand, and other processing fees. Id.; see also (Compl. ¶¶ 64-66.) As such, the Court held that "[t]his example alone should have triggered the notice of claim provisions." Benex, 2016 WL 1069657, at *4. As to Benex's second theory--"that First Data improperly and without any authority charges its merchant-customers a[n] additional discount rate on the amount of the return transaction"--the Court held that Benex failed to provide First Data sufficient notice of the claim against it. Id. at *5 (internal quotation marks omitted). Benex failed to "define what the additional discount rate [was]" or "allege that it paid this additional discount rate." Id.

On April 15, 2016, Benex filed an Amended Complaint, alleging that First Data breached the implied covenant of good faith and fair dealing. (Am. Compl., ¶¶ 68-77.) Benex also asserts an additional cause of action for breach of contract, claiming that First Data has breached its agreements with

Mastercard, and as third party beneficiaries of those agreements, Benex and members of the class have been "deprived of the benefits intended for them." (Am. Compl. ¶ 83.) On July 21, 2016, First Data filed a motion to dismiss for failure to state a claim. (See Def.'s Mot., Docket Entry 35.)

DISCUSSION[7]

## I.   Legal Standard

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). Although the Court must accept all allegations in the Amended Complaint as true, this tenet is "inapplicable to legal conclusions." Id. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citation omitted). Ultimately, the Court's plausibility determination is a "context-specific task that requires the reviewing court to draw on its

---

[7] Under the Contract's choice of law provision, New York law controls. (Program Guide § 36.1 at 28.)

judicial experience and common sense." Id. at 679, 129 S. Ct. at 1950.

In deciding a motion to dismiss, the Court is generally confined to "the allegations contained within the four corners of [the] complaint." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998). However, the Court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (internal quotation marks and citation omitted); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (observing that a document is "integral" if the complaint "relies heavily upon its terms and effect") (internal quotation marks and citation omitted).

## II. Breach of Contract

As a preliminary matter, First Data previously argued that the new breach of contract claim is "procedurally improper" and "outside the scope of the Court's Order." (Def.'s Ltr. Mot., Docket Entry 28, at 3.) Benex has failed to address why this Court should allow its breach of contract claim to go forward in light of its prior Order, which clearly held that Benex was "granted leave to replead only its implied covenant claim." Benex, 2016 WL 1069657, at *6 (emphasis supplied). Further, "[d]istrict courts

10

in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted." Palm Beach Strategic Income, LP v. Salzman, 457 F. App'x 40, 43 (2d Cir. 2012); see also Pagan v. N.Y. State Div. of Parole, No. 98-CV-5840, 2002 WL 398682, at *3 (S.D.N.Y. Mar. 13, 2002) (dismissing wrongful termination, negligent misrepresentation, and intentional infliction of emotional distress claims after district court granted leave to replead only employment discrimination claims). Therefore, Plaintiff's breach of contract claim is DISMISSED WITH PREJUDICE.

III. Implied Covenant of Good Faith and Fair Dealing

As discussed, Benex alleges two theories. First, it alleges that First Data breached the implied covenant of good faith and fair dealing by "failing to remit Interchange and Card Brand fee refunds to merchants in the event of a merchant-issued refund or chargeback." (Am. Compl. ¶ 74.) Second, it alleges that First Data further breached the implied covenant by "charging merchants a fee on the reversal of a sales transaction." (Am. Compl. ¶ 74.) The Court will summarize the relevant law and address each theory in turn.

In every contract, parties have an implicit duty of good faith and fair dealing. Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc., 429 F. Supp. 2d 582, 609 (S.D.N.Y. 2006).

Under this implied covenant, "neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990). Thus, one party may invoke the implied covenant of good faith and fair dealing where the other party "complied with the literal terms of the contract" but did "so in a way that undermines the purpose of the contract." In re HSBC Bank, USA, N.A., 1 F. Supp. 3d 34, 51 (E.D.N.Y. 2014) (internal quotation marks and citation omitted). Yet it bears emphasizing that "[t]he implied covenant 'can only impose an obligation consistent with other mutually agreed upon terms in the contract.'" Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005) (quoting Geren v. Quantum Chem. Corp., 832 F. Supp. 728, 732 (S.D.N.Y. 1993)). Moreover, the implied covenant cannot impose new duties outside the scope of the contract. Id. at 199; see also Gaia House Mezz LLC v. State Street Bank & Trust Co., 720 F.3d 84, 93 (2d Cir. 2013) ("The covenant cannot be used . . . to imply an obligation inconsistent with other terms of a contractual relationship.").

A.   Failure to Refund Interchange and Card Brand Fees

Benex alleges that when a return transaction occurs, the Issuing Bank and the Card Brand refund the Interchange and Card Brand fees to First Data and First Data "retains the fees despite the fact that it has no contractual authority or other authority

12

to do so." (Am. Compl. ¶ 11.) First Data argues that this is "exactly the same theory based on exactly the same material allegations" as the original Complaint. (Def.'s Br., Docket Entry 35, at 7.) As a result, First Data urges, "[these] allegations fare no better now than they did . . . when the Court expressly rejected them." (Def.'s Br. at 8.) Further, First Data argues that Benex's legal arguments, including their arguments regarding the meaning of "Gross Transaction Volume," must be rejected based on the Court's prior Order and the law of the case. (Def.'s Br. at 10-11.) Benex argues that First Data ignores several new allegations in the Amended Complaint, including the allegation that the phrase "Discount Fees (based on Gross Transaction Volume)" in the Contract is a heading, and the Contract specifies that headings "shall not in any way affect the meaning or construction" of the Contract. (Pl.'s Opp., Docket Entry 36, at 1). Further, it argues that the allegations in the Amended Complaint "show that Defendant's interpretation of the Agreement is overbroad and inconsistent with the express provisions of the Agreement." (Pl.'s Opp. at 9.)

At the outset, the Court declines to consider Benex's legal arguments--couched as factual allegations--regarding the interpretation of the Contract. (See, e.g., Am. Compl. ¶¶ 41-44.) This Court previously held that the Contract barred Benex's recovery; Benex agreed to pay the Discount Rate for First Data's

services based on Gross Transaction Volume, and Gross Transaction Volume is not "set-off for any refunds or Credits." Benex, 2016 WL 1069657, at *4. Benex cannot use the opportunity to file an amended complaint to re-litigate these issues. See Weslowski v. Zugibe, 96 F. Supp. 3d 308, 317 (S.D.N.Y. 2015), aff'd, 626 F. App'x 20 (2d Cir. 2015) ("The mere filing of an Amended Complaint does not entitle Plaintiff to relitigate his claims absent new factual allegations.").

Without these arguments, Benex's Amended Complaint is substantially similar to the original Complaint and offers few new factual allegations, none of which can save its claim. For example, Benex alleges that the retention of the Interchange and Card Brand fees by First Data results in a windfall "approximately five and one-half times more than it made on the original transaction." (Am. Compl. ¶ 73.) However, the express terms of the Contract continue to operate as a bar to Benex's claim regardless of the amount of the so-called windfall. Therefore, Benex's recovery on this theory is barred by the express language of the Contract. See Gaia House Mezz LLC, 720 F.3d at 93 (holding that there was no breach of the implied covenant when plaintiff sought to imply "obligations [which] conflict with the express language of the [a]greement").

B.   Additional Fee for Return Transactions

Benex alleges that First Data "imposes the same charge twice on merchants . . . in the event of refunds or chargebacks." (Am. Compl. ¶ 54.)   Specifically, Benex alleges that First Data charges a "MC/V/Discover Network Auth & Ret Trans Fee" for each credit card sale, and if the transaction is reversed, First Data charges the same fee again, (Am. Compl. ¶ 54), despite the fact that the Contract lists "MC/V/Discover Ntwk Auth & Return Trans Fee" as a single fee (Contract at 5).   The Amended Complaint includes an excerpt of Benex's February 2013 Statement which shows charges for "MASTERCARD AUTH FEE" and "MASTERCARD CREDITS TRANS FEE."   (Am. Compl. ¶ 54; Feb. 2013 Stmt. Am. Compl. Ex. E, Docket Entry 25-5, at 5.)

First Data contends that the Contract allows it to charge a "Ntwk Auth & Return Trans Fee" of $0.20 for each authorization and each return transaction.   (Def.'s Br. at 12.; Contract at 5.) It argues that processing the authorization and processing the return are separate services performed at different points in time. (Def.'s Br. at 12.)   Further, First Data points out that Benex does not dispute that the Contract permits First Data to charge this fee for authorizations, (Am. Compl. ¶ 54), and as such, First Data is permitted to charge "a fee for th[e] additional work—namely, processing the 'Return' transaction—subsequently,

separately, and apart from any prior authorizations." (Def.'s Br. at 13.)

The Court finds that Benex's recovery on this theory is also barred by the language of the Contract. The Contract lists the "MC/Visa/Discovery Ntwk Auth & Return Trans Fee" in the pricing schedule, and the name of the fee clearly indicates that the fee is imposed for authorizations and returns. (See Contract at 5 (emphasis supplied).) Although Benex contends that First Data is charging "the same fee twice," this argument is not supported by the February 2013 Statement. (Pl.'s Opp. at 14.) The Statement lists "MASTERCARD AUTH FEE" and "MASTERCARD CREDITS TRANS FEE," indicating that the $0.20 fee is imposed for different services-- one when the transaction is authorized and one when a return occurs. (See Am. Compl. ¶ 54; Feb. 2016 Stmt. at 5.)

To the extent Benex argues that the relevant contractual provisions are ambiguous and such ambiguities must be construed against First Data, that argument also fails. (Pl.'s Opp. at 20-21.) As discussed above, the Court finds that the Contract is clear regarding the retention of Interchange and Card Brand fees and the $0.20 fee for return transactions, and it is well recognized that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." MHR Capital Partners LP v. Presstek, Inc., 12 N.Y.3d 640, 645, 912 N.E.2d 43, 47, 884 N.Y.S. 2d 211 (2009).

C.    Notice of Claim Provision

Even if Benex's Amended Complaint stated a claim, failure to comply with the Contract's notice of claim provision bars any recovery.  Under New York law, "[e]xpress conditions must be literally performed; substantial performance will not suffice." MHR Capital Partners, 12 N.Y.3d at 645, 912 N.E.2d at 47; see also D.C.R. Trucking & Excavation, Inc. v. Aetna Cas. and Sur. Co., No. 96-CV-3995, 2002 WL 32096594, at *6 (E.D.N.Y. Oct. 31, 2002) ("Failure to strictly comply with contractual notice and documentation provisions has been held to constitute a waiver of any claim for damages.").

Here, the Program Guide clearly requires Benex to notify First Data of any billing issues "within 60 days of the date of the statement where the charge or funding appears."  (Contract ¶ 4 at 14; see also Program Guide § 18.10 at 16 ("If you believe any adjustments should be made . . . you must notify us in writing within sixty (60) days after any debit or credit is or should have been effected . . . .").)  The failure to do so relieves First Data of any liability.  (Program Guide § 18.10 at 16 (stating that if Benex fails to notify First Data within the applicable time period, First Data "shall not have any obligation to investigate or effect any such adjustments").)

With respect to the first theory, Benex argues that the Amended Complaint contains specific allegations demonstrating that

17

"the February 2013 account statement . . . did not show that the Interchange and Card Brand Fees . . . had been refunded by the Card Issuer and Card Brand," and as a result, it could not have known to provide notice.  (Pl.'s Opp. at 2.)  However, this Court rejected this argument in its prior Order and held that the credit reversal of $35.24 in February 2013 should have triggered the notice of claim provision.  Benex, 2016 WL 1069657, at *4.  The allegations in the Amended Complaint do not change this result. Benex alleges that First Data retained the Interchange and Card Brand fees associated with the same credit reversal of $35.24. (Am. Compl. ¶ 49.)  In addition, Benex alleges that "[t]he refunded fee activity is completely invisible to the Plaintiff" because it is not noted on the statement, and First Data "did not apprise Plaintiff that the Card Brand had refunded the . . . [f]ees in connection with the reversal of the February 14, 2013 sales transaction, nor did [First Data] indicate that it was retaining the refunded . . . fees."  (Am. Compl. ¶¶ 50, 52.)  In light of this Court's prior ruling and Benex's concession that it was "obviously aware that it had not received the refunded fees," (Am. Compl. ¶ 53), this argument fails.

With respect to the second theory, Benex asserts that "because the[ ] [fees] are shown as two separate fees on the account statements, Plaintiff d[id] not, and could not, know that it was assessed the same fee twice in connection with reversed

transactions." (Am. Compl. ¶ 55.) As a result, it maintains that "merchants . . . were precluded from providing notice." (Am. Compl. ¶ 55.) However, the February 2013 Statement contains all the information necessary for Benex to provide the required notice. Under "Fees Charged," the statement contains an itemized list which shows that a "MASTERCARD AUTH FEE" and a "MASTERCARD CREDIT TRANS FEE" were charged on February 28, 2013. Thus, the notice of claim provision was triggered on February 28, 2013, when Benex concedes that the fees "distinctly" appeared on its statement. (Am. Compl ¶ 54.) Further, the Court agrees with First Data that even if Benex did not understand the charges, nothing prevented it from giving notice and disputing or requesting clarification of the fees charged. (Def.'s Br. at 13.)

Benex's remaining arguments related to its failure to provide notice--including that First Data hindered its ability to provide notice and that notice was futile—-also fail. (Pl.'s Opp. at 17-18). For example, Benex relies on Kaiser Foundation Health Plan, Inc. v. MedQuist, Inc., No. 08-CV-4376, 2009 WL 961426 (D. N.J. Apr. 8, 2009), to argue that its failure to provide notice should be waived under the prevention doctrine. (Pl's Opp. at 17-18.) Under New York law, this doctrine provides that "a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." Kooleraire Serv. & Installation

Corp. v. Bd. of Ed. of City of N.Y., 28 N.Y.2d 101, 106, 268 N.E.2d 782, 784, 320 N.Y.S.2d 46 (1971).  In Kaiser, plaintiffs alleged that defendants "actively concealed the nature of the inflated billings," "refus[ed] to release information to [plaintiff] about the manner in which its invoices were calculated" and "purposely frustrated their ability to act."  Kaiser, 2009 WL 961426, at *5. The court held that the claims could proceed despite the fact that plaintiffs failed to give notice pursuant to the terms of the contract.  Id.

Unlike in Kaiser, the Amended Complaint does not allege that First Data "wrongfully" withheld information about the applicable fees or provided misleading billing statements.  See Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc., 807 F. Supp. 1007, 1022 (S.D.N.Y. Aug. 7, 1992) ("The doctrine of prevention excuses a condition precedent when a party wrongfully prevents that condition from occurring.") (internal quotation marks and citation omitted).  In its opposition brief, Benex argues that First Data "could have informed" Plaintiff that it retained refunded Interchange and Card Brand fees and "could have used the same term" for the additional return fee to prevent confusion.  (Pl's Opp. at 18.)  Even if Benex was permitted to pursue these allegations-- which do not appear in the Amended Complaint--these allegations are insufficient to establish that First Data purposely and wrongfully prevented Benex from giving the proper notice.  See

Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998) (declining to consider claim that was alleged in opposition to motion to dismiss but not in complaint).

Finally, Benex argues that notice was futile because "if such notice is given, any determination by [First Data] is discretionary" and the Contract states that "it shall not have any obligation to . . . effect any such adjustments." (Pl.'s Opp. at 19 (ellipsis in original); Program Guide § 18.10 at 16.) Specifically, Benex maintains that since First Data has retained the Interchange and Card Brand fees, it has "already determined that it was entitled to those refunds under the Agreement" and providing notice would have been futile. (Pl.'s Opp. at 19.) Benex has mischaracterized the relevant language. Section 18.10 of the Program Guide states that if a merchant notifies First Data more than sixty days after the adjustment should have been made, First Data may, in its discretion, assist the merchant and investigate the billing irregularity. (See Program Guide § 18.10 at 16.)

Therefore, the Court finds that in addition to the express terms of the Contract, Benex's failure to comply with the notice of claim provision bars any recovery. Benex's implied covenant claim is DISMISSED WITH PREJUDICE.

## CONCLUSION

Defendant's motion to dismiss the Amended Complaint (Docket Entry 34) is GRANTED and Plaintiff's claims are DISMISSED WITH PREJUDICE. The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     November __14__, 2016
           Central Islip, New York